[No. C060697. Third Dist. Apr. 13, 2010.]

SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

SAN JOAQUIN RIVER GROUP AUTHORITY, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

1112

**COUNSEL**

Minasian, Spruance, Meith, Soares & Sexton, Paul R. Minasian and Dustin C. Cooper for Plaintiff and Appellant San Joaquin River Exchange Contractors Water Authority.

O'Laughlin & Paris, Tim O'Laughlin, William C. Paris III, Kenneth Petruzzelli and Katie J. Shea for Plaintiff and Appellant San Joaquin River Group Authority.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Denise Ferkich Hoffman, Teri H. Ashby and Russell B. Hildreth, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**BUTZ, J.**—This appeal involves two water quality problems in the San Joaquin River. The first problem concerns high levels of salt and boron in a 130-mile stretch from Mendota Dam (west of Fresno) to Vernalis (near Tracy), a stretch referred to as the Lower San Joaquin River. The second problem involves low levels of dissolved oxygen in Stockton's Deep Water Ship Channel (Ship Channel).

To address these problems, respondent Central Valley Regional Water Quality Control Board (Regional Board), and in turn respondent State Water Resources Control Board (State Board; collectively, the Boards), approved two amendments to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins (Basin Plan).

The first amendment establishes discharge limits for salt and boron, known as "Total Maximum Daily Loads" (TMDL's), and sets forth an implementation program. We refer to the first amendment as the "Salt/Boron TMDL Amendment."

The second amendment requires studies from entities responsible for oxygen demand in the Ship Channel, which will then be used to set a TMDL for dissolved oxygen (DO) in the channel. We refer to the second amendment as the "DO Amendment."

Through petitions for writ of mandate, and now on appeal, appellants San Joaquin River Group Authority (River Group) and San Joaquin River Exchange Contractors Water Authority (River Exchange) contend that these amendments violate state and federal water law and the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). River Group and River Exchange are comprised of public agencies and mutual water companies that supply irrigation water to San Joaquin Valley farmers.

We shall affirm in full the trial court's thorough and well-reasoned decision, which denied the petitions except for one issue: whether a substitute for the salt/boron TMDL was as effective as a TMDL.

## FACTUAL AND PROCEDURAL BACKGROUND

The two water quality amendments at issue flow from state and federal water quality law. In a nutshell, that law is as follows.

*Federal law*

█ The federal Clean Water Act (the Clean Water Act) (33 U.S.C. § 1251 et seq.) places primary reliance for developing water quality standards on the states (termed "water quality objectives" in California). (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 697, fn. 11 [39 Cal.Rptr.3d 189] (*SWRCB Cases*); *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1403 [38 Cal.Rptr.3d 373] (*City of Arcadia*); Wat. Code, §§ 13050, subd. (h), 13241; 40 C.F.R. § 130.2(d) (2009).)

The Clean Water Act focuses on two possible sources of pollution: point and nonpoint. (*City of Arcadia, supra,* 135 Cal.App.4th at p. 1403.) "Point" sources refer to discrete discharges, such as from a pipe. (*Ibid.*) "Nonpoint" refers to everything else, including agricultural runoff. (*Ibid.*)

When the Clean Water Act's permit program, applicable to point sources, fails to clean up a river or river segment, states are required to identify such waters and list them in order of priority. Based on that listing, known as the "section 303(d) list" (Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92-500 (Oct. 18, 1972) 86 Stat. 816, § 303(d), codified in 33 U.S.C. § 1313(d)), states are to calculate levels of permissible pollution in TMDL's (i.e., total maximum daily loads). (*City of Arcadia, supra,* 135 Cal.App.4th at p. 1404.)

A TMDL defines the maximum amount of a pollutant that can be discharged or "loaded" into the relevant water segment from all sources. A TMDL must be established at a level that will implement the applicable water quality objective. (*City of Arcadia, supra,* 135 Cal.App.4th at p. 1404.) A TMDL is comprised of a "wasteload allocation" that applies to point sources, a "load allocation" that applies to nonpoint sources, and a "margin of safety" to account for any lack of knowledge concerning the relationship between the pollutant and water quality. (*Id.* at pp. 1404–1405.)

*State law*

█ "California implements the Clean Water Act through the Porter-Cologne [Water Quality Control] Act (Wat. Code, § 13000 et seq.) . . . . Under the Porter-Cologne Act, nine regional boards regulate the quality of waters within their regions under the purview of the State Board. (Wat. Code, §§ 13000, 13100, 13200, 13241, 13242.)

"Regional boards must formulate and adopt water quality control plans, commonly called basin plans, which designate the beneficial uses [of the water] to be protected, water quality objectives and a program to meet the objectives. (Wat. Code, §§ 13050, subd. (j), 13240.) ' "Water quality objectives" means the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area.' (*Id.*, § 13050, subd. (h).)" (*City of Arcadia, supra*, 135 Cal.App.4th at p. 1405.)

With this legal background in mind, we provide a brief background of the two water quality amendments at issue. We will add facts as necessary in discussing the issues on appeal.

*Salt/Boron TMDL Amendment*

The Lower San Joaquin River (running northward from Mendota Dam to Vernalis) is on California's section 303(d) list of impaired waters due to high levels of salt and boron.

The salt and boron impairment in the Lower San Joaquin River has occurred primarily from large-scale water development coupled with extensive agricultural land use and associated runoff (largely from western San Joaquin Valley farmers) into the Lower San Joaquin River watershed. The large-scale water development referred to is the federal Central Valley Project, which diverts Sierra Nevada mountain-fed San Joaquin River water to the southern San Joaquin Valley, replacing it with water pumped from the Delta through the Delta-Mendota Canal to irrigate the agricultural west side of the San Joaquin Valley.

In its 1995 "Bay-Delta Plan" for water quality control in the Delta, the State Board adopted a salinity water quality objective (WQO) to be measured near Vernalis (at the southern tip of the Delta). (See *SWRCB Cases, supra*, 136 Cal.App.4th at p. 701.) In 1999, the State Board adopted Water Right Decision 1641, which implements this "Vernalis Salinity WQO." The Bay-Delta Plan and decision 1641 also directed the Regional Board to adopt salinity objectives and an implementation program for the Lower San Joaquin River.

Under the Salt/Boron TMDL Amendment approved by the Boards, agricultural dischargers of runoff from irrigated lands in the Lower San Joaquin

River area must meet the Vernalis Salinity WQO (1) by stopping discharge unless the discharge is within a numerical limit over a 30-day running average, or (2) by operating under a waste-discharge requirement that limits salt or under a waiver of that requirement. The implementation program for this TMDL allows releases of salty agricultural drainage water only when the assimilative capacity of the Lower San Joaquin River is high (i.e., "real-time" releases).

*DO Amendment*

The Ship Channel is on California's section 303(d) list of impaired waters due to low levels of DO.

The Regional Board determined that the Ship Channel's low DO level is caused jointly and severally by three factors: (1) the channel's geometry (deeper and wider than the adjacent river segments); (2) reduced flow (river flow is diverted to Central Valley Project and California State Water Project pumps near Tracy); and (3) oxygen-demanding substances (agricultural runoff and wastewater facility discharges cause algae growth). Of these three factors, only the oxygen-demanding substances are a waste-discharge (i.e., load) factor.

The DO Amendment is different from the Salt/Boron TMDL Amendment in that it only requires, for now, certain studies to be performed to obtain information to set a TMDL for oxygen-demanding substances later. A three-step program is involved, with only the first step actually at issue here. First, entities responsible for point and nonpoint sources of oxygen-demanding substances (and their precursors) must perform certain studies to establish wasteload and load allocations. This part of the program allows discharges to continue in the interim if the studies are being done. Second, the Boards, using the studies, are to implement a TMDL in December 2009 or later. And, third, parties such as River Group and River Exchange must comply with the TMDL at or before the end of 2011.

Additionally, the Regional Board instructed that agencies responsible for the Ship Channel's design geometry and reduced flow reduce their oxygen demand factors.

## DISCUSSION

### I. Standard of Review Under Water Law and CEQA

Water quality control plans, including the establishment of a TMDL, are quasi-legislative, scientific-evidence-based administrative actions subject to

deferential review under the traditional mandamus standard. That standard asks whether the agency's action was arbitrary, lacking in evidentiary support, or contrary to law. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, 572 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [109 Cal.Rptr.2d 454]; *State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697, 701–702 [16 Cal.Rptr.2d 25]; Pub. Resources Code, § 21168.5.)

## II. Water Law Issues: Salt/Boron TMDL Amendment

### A. *The Vernalis Salinity WQO Is Applicable to the Salt/Boron TMDL Amendment*

██ River Group contends that the Salt/Boron TMDL Amendment violates the federal Clean Water Act and the state Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) (Porter-Cologne Act) by failing to implement an applicable WQO. Specifically, River Group asserts that the Vernalis Salinity WQO, which was used for this TMDL, applies only to the southern Delta and not to the Lower San Joaquin River. We disagree.

The Boards note that the Regional Board is currently developing salinity WQO's upstream of Vernalis (i.e., the Lower San Joaquin River), which will be adopted in a future Basin Plan amendment; the existing Vernalis Salinity WQO is being used in the interim.

This use of the Vernalis Salinity WQO, as the Boards argued, makes sense, and is a reasonable administrative action supported by the evidence. Vernalis is at the northern or downstream boundary of the Lower San Joaquin River, where it flows directly into the southern Delta. Vernalis is the farthest downstream point on the San Joaquin River unaffected by tidal influences and salts from San Francisco Bay and therefore receives salt only upstream from the Lower San Joaquin River; salt and boron loads at Vernalis are equal to the total load from the entire salt/boron TMDL project area.

River Group counters that, under the state Porter-Cologne Act, WQO's "are established for the reasonable protection of beneficial uses of water or the prevention of nuisance *within a specific area*." (Wat. Code, § 13050, subd. (h), italics added.) Along similar lines, River Group points to language in this court's opinion in *SWRCB Cases, supra*, 136 Cal.App.4th 674, that "[t]he southern Delta agricultural salinity objectives in the 1995 Bay-Delta Plan, including the Vernalis salinity objective, were formulated specifically to maintain an adequate level of protection for agriculture in the southern Delta." (*Id.* at p. 744.)

This statutory and decisional language, however, does not render the Vernalis Salinity WQO inapplicable to the Salt/Boron TMDL Amendment, given that Vernalis receives salt only upstream from the Lower San Joaquin River and that the Lower San Joaquin River flows directly into the southern Delta at Vernalis. These facts reasonably link the southern Delta (at Vernalis) to the Lower San Joaquin River as "a specific area" concerning the water quality problem at issue here—salt and boron loads flowing down the Lower San Joaquin River to Vernalis.[1] Also, as the trial court noted, the record shows that, in line with the "beneficial use[]" language set forth in the Porter-Cologne Act (Wat. Code, § 13050, subd. (h)), the Vernalis Salinity WQO is designed to protect the beneficial use of water for agriculture, a use for the Lower San Joaquin River designated in the Basin Plan.

### B. Water Code Section 13241 Factors and Underground Regulation Involving Salt/Boron TMDL Amendment

River Group argues that the Salt/Boron TMDL Amendment, by applying the Vernalis Salinity WQO upstream of the southern Delta (i.e., to the Lower San Joaquin River), either amended an existing WQO or adopted a new one. Either way, River Group continues, the Salt/Boron TMDL Amendment constitutes an illegal underground regulation because the TMDL proceeding was not noticed as one adopting a new or revised WQO and because the factors set forth in Water Code section 13241 for "establishing water quality objectives" were not considered (these factors include past, present, and future beneficial uses; environmental characteristics; water quality conditions; and economic considerations). (Wat. Code, § 13241.) We disagree.

As for notice, as the trial court pointed out, the record is replete with notice that the Regional Board was using the Vernalis Salinity WQO as the water quality objective to be achieved by the Salt/Boron TMDL Amendment for the Lower San Joaquin River.

As for the Water Code section 13241 factors, they apply, in the words of that statute, "in *establishing* water quality objectives." (Wat. Code, § 13241, italics added.) The Vernalis Salinity WQO was already established. In this vein, the Regional Board noted that the Salt/Boron TMDL Amendment did not establish a WQO, but rather was a "program of implementation for achieving water quality objectives," in the words of Water Code section 13242, for which the section 13241 factors need not be considered. (Wat. Code, § 13242.) In light of what we said in the previous section of this

---

[1] Boron is not addressed separately in the Salt/Boron TMDL Amendment, because reductions in salt discharges to the Lower San Joaquin River will also reduce boron discharges.

opinion concerning the geographical and salinity linkage between Vernalis and the Lower San Joaquin River, this may be considered a distinction *with* a difference. (This analysis also disposes of River Exchange's contention that the Boards prepared an inadequate economic analysis required by Wat. Code, § 13241.) (Wat. Code, § 13241, subd. (d) ["Economic considerations" is a factor to consider in *establishing* a WQO].)

In any event, lest we be accused of splitting hairs, the trial court also stated, supported by citations to the record (and bolstered by additional citations we have found), that the Regional Board "developed the [Salt/Boron TMDL Amendment] based on the Vernalis standard in thorough technical studies which effectively considered the factors that the board is required to consider under Water Code section 13241 in . . . establishing [WQO's]."

### C. The Necessity of the Salt/Boron TMDL Amendment

In a series of related contentions, River Group and River Exchange question the necessity for the Salt/Boron TMDL Amendment.

#### 1. Vernalis Salinity WQO allegedly always met without Salt/Boron TMDL Amendment.

The first of these contentions arises from the Boards' acknowledgement that the Vernalis Salinity WQO has been met since it became effective in 1995. There are two glaring points to consider in this regard, however.

First, the Regional Board qualified this acknowledgement as follows: "[H]owever, this period [i.e., the last eight years from 1995] is not representative of the full range of climatic/hydrologic conditions that can occur. The last eight years have been relatively wet ([four] wet years, [two] above normal, [two] below normal, and [one] dry) [*sic*] and it is unlikely that the standard will continue to be met under drier conditions."

This qualification seems reasonable. After all, nature bats last. In fact, the 2004 "Technical Report" for the Salt/Boron TMDL Amendment remarks: "Water quality data collected by Regional Board staff over the past 15 years indicates that [WQO's, including for salt and boron] have been routinely exceeded throughout the [Lower San Joaquin River]."

The second point is set forth in the Boards' brief on appeal: "Moreover, and perhaps most important, is the fact that water quality objectives are met at Vernalis only because the [United States] Bureau [of Reclamation, as part of the Central Valley Project] releases clean, pure, snow-melt water from the New Melones Reservoir, sending it down the Stanislaus River, which meets

the [Lower San Joaquin River] *just upstream from Vernalis*, where the salinity is monitored. . . . The Salt & Boron TMDL seeks to clean up the *entire reach* of the polluted [Lower San Joaquin River] above the Stanislaus River . . . ." (First italics added.)

 2. *United States Bureau of Reclamation is allegedly the sole cause of salt impairment.*

What the United States Bureau of Reclamation (the Bureau) washes with the one hand, it pollutes with the other, according to a related argument from River Exchange.

River Exchange contends that because the federal Ninth Circuit Court of Appeals has concluded that the Bureau is legally required under a federal water statute (the San Luis Act of 1960, Pub.L. No. 86-488 (June 3, 1960) 74 Stat. 156) to provide salt-boron drainage (away from the Lower San Joaquin River) for agricultural lands (such as River Exchange), which exchanged their San Joaquin River water rights for saltier Central Valley Project water delivered through the Delta-Mendota Canal, the salinity problem is *solely* the Bureau's fault. (*Firebaugh Canal Co. v. U.S.* (9th Cir. 2000) 203 F.3d 568, 577.) Not so.

Undoubtedly, the Bureau bears some responsibility, as the Boards concede, but so do the westside San Joaquin Valley farmers served by River Exchange and River Group. It is these farmers who have contracted to receive this saltier water, who irrigate with it as well as with groundwater, and who farm the west side of the San Joaquin Valley where the soils are naturally high in salts and boron.

River Group claims the State Board's 1999 Water Right Decision 1641 places responsibility for implementing the Vernalis Salinity WQO *solely* on the Bureau. There are two problems with this. First, we are concerned here with the Lower San Joaquin River and not just Vernalis. And, second, decision 1641 agrees with the Regional Board's conclusion that the "salt and boron water quality impairment in the [Lower San Joaquin River] has occurred, in large part, as a result of large-scale water development [i.e., the Bureau's Central Valley Project] *coupled with* extensive agricultural land use . . . ." (Italics added.)

It should also be noted the trial court found that the control program for the Salt/Boron TMDL Amendment "recognizes the [Bureau's] role in impairing [Lower San Joaquin River] water quality" and "effectively requir[es] the [Bureau] to mitigate salt loads in [its] water supplies in excess of the load allocations."

3. *The Lower San Joaquin River was section 303(d)-listed for salinity allegedly without any data, evidence, citations or analysis.*

River Group makes this contention, but its own citations and words defeat it.

One of the citations River Group uses to support this contention states instead that "[t]hese pollutants [i.e., salt and boron] are well documented to be impairing the [Lower San Joaquin River] and should have been included on the earlier [section 303(d)] list."

As for its words, the introduction in River Group's opening brief speaks for itself on this point: "[The Boards] began evaluating potential salinity objectives for the [Lower San Joaquin River] as early as 1985. As of 2004 no new salinity objectives were established and the United States Environmental Protection Agency . . . was increasingly pressuring [the Boards] to establish a . . . TMDL . . . . To placate the [EPA] and preserve its funding, the [Regional Board] adopted a TMDL for salt and boron for the [Lower San Joaquin River] in September 2004. . . . The [Regional Board] would . . . use a southern Delta salinity objective [i.e., the Vernalis Salinity WQO] and develop applicable salinity objectives for the [Lower San Joaquin River] later."

And if this citation and these words are not convincing enough, then the following observation from the state Court of Appeal over 23 years ago should suffice: "In this region [i.e., southern Delta] water quality degradation is caused not by oceanwater intrusion but mainly by upstream depletions of the San Joaquin River and salt infusion from irrigation waste-water runoff carried by the San Joaquin River." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 121 [227 Cal.Rptr. 161].)

We conclude there is sufficient evidence supporting the Lower San Joaquin River's section 303(d) listing for salinity.

And since the Lower San Joaquin River was so listed, that dispenses with River Group's additional argument that the State Board misinterpreted the federal Clean Water Act by concluding that it (the board) could establish a TMDL regardless of such listing.

4. *Regional Board allegedly misinterpreted the 1995 Bay-Delta Plan and the 1999 Water Right Decision 1641 as directing a TMDL for salt/boron.*

River Group argues that the Regional Board, in adopting the Salt/Boron TMDL Amendment, abused its discretion by misinterpreting the 1995 Bay-Delta Plan and the 1999 Water Right Decision 1641 as "*directing* establishment of a TMDL and thereby eliminating its discretion to consider or adopt other actions." (Italics added.)

However, River Group also acknowledges, in this very argument, that Water Right Decision 1641 "directed the [Regional Board] to 'promptly develop and adopt salinity objectives and a program of implementation for the main stem of the San Joaquin River upstream of Vernalis [i.e., the Lower San Joaquin River],' [for which] the [Regional Board] 'should evaluate a program to regulate the timing of agricultural discharges to the San Joaquin River . . . .' " Enough said.

### D. *Salt/Boron TMDL Amendment Is Defined Properly in Legal Terms*

River Exchange raises two points in this respect.

First, River Exchange contends that the Salt/Boron TMDL Amendment improperly defines "load" to mean a "concentration" standard rather than an "amount of matter" standard. The latter term appears in the applicable regulation. (40 C.F.R. § 130.2(e) (2009).)

As the trial court noted persuasively, even assuming there is a distinction between these two standards, the applicable regulation also states that "[TMDL's] can be expressed in terms of either mass per time, toxicity, *or other appropriate measure*." (40 C.F.R. § 130.2(i) (2009), italics added.) The concentration standard seems appropriate.

River Exchange disagrees with this approach, noting that a TMDL must still reflect a daily *load*: i.e., an amount of matter introduced into the water. (40 C.F.R. § 130.2(e) (2009).) But River Exchange's concern is covered essentially by the Salt/Boron TMDL Amendment's numeric target that is based, as River Exchange concedes in its brief, on "a maximum 30-day running average of mean daily EC [amount measured as electrical conductivity] . . . ."

Second, in a related contention, River Exchange argues that the Salt/Boron TMDL Amendment's 30-day running average is not a total maximum *daily* load, but a total maximum *monthly* load.

■ Two federal appellate decisions have split on the interpretation of the term "daily" in the TMDL law. One court has said that "[d]aily means daily, nothing else." (*Friends of the Earth, Inc. v. Environmental Protection Agency* (D.C. Cir. 2006) 371 U.S. App.D.C. 1 [446 F.3d 140, 142].) The other tribunal found such an interpretation "absurd," because for some pollutants, "effective regulation may best occur by some other periodic measure than a diurnal one." (*Natural Resources Defense Council v. Muszynski* (2d Cir. 2001) 268 F.3d 91, 98–99 (*Muszynski*).) Apparently, salt/boron is one such pollutant. According to the Technical Report for the Salt/Boron TMDL Amendment, the 30-day running average was used because "much of the available data and modeling tools . . . are only available for a monthly time step," and "most agricultural water districts lack the facilities needed to manage drainage on a daily basis."

The trial court did note, however, that this Technical Report did not clearly indicate, as required by *Muszynski*, that this "Total Maximum Monthly Load" (TMML) was as effective as a TMDL (in achieving the Vernalis Salinity WQO), and the court issued a peremptory writ of mandate on this basis. (See *Muszynski, supra*, 268 F.3d at pp. 99, 103.) In light of the Technical Report's rationale for the TMML, quoted in the preceding paragraph, we agree with the trial court on this point.

### III. Water Law Issues: DO Amendment

River Exchange makes a series of overlapping arguments concerning the DO impairment in the Ship Channel.

■ River Exchange contends that the Boards, by currently assigning joint and several responsibility (100 percent each) to the three impairment factors of geometry, reduced flow, and oxygen-demanding substances, (1) distort the definition of a TMDL; (2) fail to specify what the TMDL load allocation is; and (3) disproportionately make the entities responsible for oxygen-demanding substances (and therefore subject to a TMDL) rectify the DO impairment, while letting off the hook those responsible for geometry (U.S. Army Corps of Engineers dredging) and reduced flow (federal Central Valley Project diversions) in contravention of federal law (§ 401 of the Clean Water Act (33 U.S.C. § 1341)). Section 401 requires federal agencies to meet state water quality standards to obtain permits for federal projects. (33 U.S.C. § 1341; 40 C.F.R. § 131.1 (2009).)

These three issues stem from the fact that the Ship Channel's DO impairment results from one factor subject to discharge requirements (oxygen-demanding substances) and two factors not so (geometry and re-duced flow). This state of affairs, however, is the state of affairs in the Ship

Channel and must be dealt with as such: remedy through control of discharges and control of other factors contributing to the impairment. This is what the DO Amendment envisions.

With respect to distorting the definition of a TMDL, the DO Amendment, at this point, requires only that studies of oxygen-demanding substances be performed so that a TMDL can be set for them in 2009 or later. This is also why a TMDL's load allocation has not yet been specified.

Nor does the DO Amendment's control program ignore geometry and reduced flow. Under that program, the Regional Board "will require any project that requires a Clean Water Act Section 401 . . . [c]ertification from the [Regional Board], and that has the potential to impact [DO] conditions in the [Ship Channel], to evaluate and fully mitigate those impacts. This includes, but is not limited to: a) Future projects that increase the cross-sectional area of the [Ship Channel][;] [¶] [and] b) Future water resources facilities projects that reduce flow through the [Ship Channel]." Moreover, the Regional Board has instructed that the U.S. Army Corps of Engineers should reduce the impacts of the existing Ship Channel geometry on oxygen demand, and that the agencies responsible for existing water resource facilities that reduce flow to the channel should evaluate and reduce their impacts on oxygen demand—as specified in the DO control program for both.

### IV. CEQA Law That Applies: Basin Plan Is a Certified Regulatory Program Under CEQA

The CEQA statutory framework is set forth in Public Resources Code section 21000 et seq.[2] (See § 21050.)

The California Secretary of the Resources Agency has "certified" the Boards' Basin Plan process as meeting certain environmental standards. (§ 21080.5, subd. (a); Cal. Code Regs., tit. 14, § 15251, subd. (g); see Cal. Code Regs., tit. 23, § 3775 et seq.) Under CEQA law, such "certified regulatory programs" may use a program-generated written report with sufficient environmental analysis—for example, here the "Final Staff Report(s)" for the Salt/Boron TMDL Amendment and the DO Amendment (see fns. 3 & 5, *post*)—in lieu of an environmental impact report (EIR) or a negative declaration. (§ 21080.5, subds. (a), (b), (d)(3); *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 551–552 [45 Cal.Rptr.2d 117].) As an in-lieu EIR, such a report must describe the project, reasonable alternatives to it, and mitigation measures for its environmental impacts (or a statement of overriding considerations), and

---

[2] Further undesignated statutory references are to the Public Resources Code.

must be available for a reasonable time for review and comment by other public agencies and the general public. (§ 21080.5, subd. (d)(3); see also § 21081, subd. (b); Cal. Code Regs., tit. 23, § 3777.) Certified regulatory programs are also exempt from the largely procedural requirements of CEQA law found in chapters 3 and 4 of the Public Resources Code (respectively, §§ 21100 et seq. [state agencies], 21150 et seq. [local agencies]).

## V. CEQA Issues: Salt/Boron TMDL Amendment

### A. Final Staff Report for Salt/Boron TMDL Amendment Constitutes Proper In-lieu Equivalent of EIR

River Exchange contends it is unclear whether the Regional Board's "Final Staff Report for the Salt/Boron TMDL Amendment"[3] (accompanied by technical studies) is intended to be the functional equivalent of an EIR or a negative declaration.

The trial court found the report to be an EIR equivalent "with substantially more environmental analysis than a negative declaration." The record supports this finding.

The Final Staff Report describes the project. It evaluates four alternatives: no project/no action; discharge prohibition; base-load TMDL (stringent salt discharge limit at all times); and real-time TMDL (salt discharges tied to real-time assimilative capacity of the Lower San Joaquin River; this is the recommended alternative). The report evaluates 15 options for implementing the Salt/Boron TMDL Amendment based on their feasibility, cost, flexibility, time needed to implement and likelihood of success, leaving this decision to the discharger. And the Final Staff Report includes the environmental impact checklist (required by certified regulatory program regulation [Cal. Code Regs., tit. 23, § 3777]), and significantly discusses potential impacts. Three impacts to biological resources were found to be potentially significant: to certain identified species, to riparian habitat, and to wetlands, all based on reduced drainage flows to the Lower San Joaquin River.

### B. Description of Salt/Boron TMDL Amendment Project Setting and No-project Alternative

River Group and River Exchange contend that the Final Staff Report for the Salt/Boron TMDL Amendment inadequately describes this TMDL's

---

[3] See Final Staff Report for the Salt/Boron TMDL Amendment, September 10, 2004, entitled "California Environmental Protection Agency, Regional Water Quality Control Board, Central Valley Region, Amendments to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins for the Control of Salt and Boron Discharges into the Lower San Joaquin River."

project setting (environmental baseline) and no-project alternative, because the Vernalis Salinity WQO would always be met and the federal government was obligated to build an agricultural runoff drain to capture the salt and boron before they drained into the Lower San Joaquin River.

For the reasons already set forth in this opinion in part II.C. of the Discussion ("The Necessity of the Salt/Boron TMDL Amendment")— especially subparts 1. ("Vernalis Salinity WQO allegedly always met without Salt/Boron TMDL Amendment"), 2. ("United States Bureau of Reclamation is allegedly the sole cause of salt impairment") and 3. ("The Lower San Joaquin River was section 303(d)-listed for salinity allegedly without any data, evidence, citations or analysis") (see pp. 1120–1122, *ante*)—we reject these contentions.

River Group adds a related argument. It contends that none of the project alternatives set forth were feasible. The argument is that feasible project alternatives must comply with laws and regulations (see § 21061.1), but the Vernalis Salinity WQO is an inapplicable objective and the Salt/Boron TMDL Amendment is an illegal underground regulation.

For the reasons already set forth in this opinion in parts II.A. ("The Vernalis Salinity WQO Is Applicable to the Salt/Boron TMDL Amendment") and II.B. ("Water Code Section 13241 Factors and Underground Regulation Involving Salt/Boron TMDL Amendment") of the Discussion (see pp. 1118–1120, *ante*), we reject this additional contention.

### C. Environmental Impacts of Salt/Boron TMDL Amendment's Compliance Methods (§ 21159)

River Group and River Exchange contend the Final Staff Report failed to analyze the environmental impacts of constructing and operating infrastructure to comply with the real-time salt/boron TMDL, including, most prominently, the possible temporary storage of up to 50,000 acre-feet of agricultural drainage awaiting high assimilative flow in the Lower San Joaquin River. This failure allegedly violates section 21159 as applied in *City of Arcadia, supra*, 135 Cal.App.4th 1392. We disagree.

Section 21159 specifies that when an agency adopts a regulation requiring the installation of pollution control equipment or a performance standard or treatment requirement, the agency must analyze the reasonably foreseeable environmental impacts of the compliance methods. (§ 21159, subd. (a)(1).)

*City of Arcadia* interpreted section 21159 in a case in which the Los Angeles Regional Water Quality Control Board approved a "Trash TMDL"

of zero trash discharge for municipal stormwater drainage into the Los Angeles River. The regional board used the functional equivalent of a negative declaration under its certified regulatory program. (*City of Arcadia, supra*, 135 Cal.App.4th at pp. 1401–1402, 1421–1425.) The *City of Arcadia* court concluded that the functional equivalent of an EIR was required instead. The court rejected the boards' claim that they were unable to analyze the environmental impacts of the compliance methods for the Trash TMDL because the methods, at that point, were only " 'speculative possibilities.' " (*Id.* at pp. 1425–1426.) The court observed that only a particular type of compliance method—a full-capture vortex separation system unit—would fully meet the zero trash target. (*Id.* at p. 1425; see *id.* at pp. 1416, 1424.)

The present case, as the trial court concluded, differs from *City of Arcadia* in two critical respects. First, the regional board here completed the functional equivalent of an EIR for the Salt/Boron TMDL Amendment, rather than a negative declaration. And, second, the compliance methods here, at this point, are indeed " 'speculative possibilities.' " As noted, the Final Staff Report for the Salt/Boron TMDL Amendment evaluated 15 options for implementing this TMDL based on their feasibility, cost, flexibility, time to implement and likelihood of success, leaving this decision to the discharger. As the trial court aptly noted, ". . . CEQA analysis cannot reasonably be performed until the . . . dischargers [individually or collectively] choose the methods and infrastructure they will use to manage irrigation return flows in excess of their TMDL load allocations and apply for required permits to develop and operate management facilities."

River Exchange adds another argument on the subject of section 21159. Regarding the recommended alternative of real-time assimilative discharge, the Final Staff Report stated that "[d]rainage re-use . . . has the potential to adversely effect [*sic*] groundwater quality th[r]ough surface water application and resulting percolation of high salinity drain water, and through leaching of minerals from the soil profile." River Exchange complains that this point is "not discussed at all by the Boards." Yes, it is. River Exchange needed to turn to the next page of the Final Staff Report, which, after discussing specific mitigation measures for such re-use, concluded that the "proposed [Salt/Boron TMDL Amendment] would therefore not have a substantial impact on groundwater quality."

### D. Use of Freshwater Flow to Mitigate Salt/Boron TMDL Amendment Drainage Reduction Impacts (Water Supplies)

■ River Group contends there is insufficient evidence to support the Final Staff Report's statement that "[p]otential impacts [to the three biological resources—certain species, riparian habitat, wetland protection] caused by

reduced flows (resulting from drainage reductions) can be mitigated further by the addition of [freshwater] flows to replace irrigation return flows removed as a result of [the Salt/Boron TMDL Amendment] control program." For this point, River Group relies on the principle set forth in *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 [53 Cal.Rptr.3d 821, 150 P.3d 709]: If a proposed development project requires a new or additional water supply, the lead agency under CEQA must identify and analyze the sources of that supply and consider the impacts of acquiring it. (40 Cal.4th at pp. 430–432.) We disagree with River Group's contention.

The present situation is unlike *Vineyard*. The Final Staff Report recommends that the State Board exercise its water rights authority to provide for this flow in the Lower San Joaquin River, if needed. In other words, as the Boards note in their briefing, no new water need be found and imported to the project, as *Vineyard* contemplates. Instead, an adjustment of existing water allocations affecting the Lower San Joaquin River might be done by the State Board, if necessary.

### E. Statement of Overriding Considerations for Salt/Boron TMDL Amendment

The Boards concluded that "[d]espite potentially significant impacts to biological resources, there is an overriding need to protect the beneficial uses of the [Lower San Joaquin River]," and that the Salt/Boron TMDL Amendment "balances the need to protect the beneficial uses of the [Lower San Joaquin River] versus the potential adverse environmental effect of reduced flows in the [Lower San Joaquin River] upstream of Vernalis."

River Group and, in a similar argument, River Exchange, contends there is insufficient evidence that the identified benefits of the Salt/Boron TMDL Amendment outweigh its unmitigated environmental impacts because (1) the Boards wrongly characterized the source of the salinity problem (i.e., the project setting), and the no-project alternative could achieve the same benefits; (2) the impacts from the foreseeable methods of compliance were not adequately analyzed under section 21159; and (3) the impacts from TMDL-related drainage reductions were not sufficiently mitigated with identified water supplies.

We just previously rejected each of these three premises individually. Accordingly, we reject the "overriding" argument based on them as well.

### F. Brief Summary of Salt/Boron TMDL Amendment

River Exchange contends the Final Staff Report for the Salt/Boron TMDL Amendment fails to include a brief summary of the proposed action and its

consequences, in violation of the "Guidelines for Implementation of the California Environmental Quality Act." (Cal. Code Regs., tit. 14, §§ 15000 et seq., 15123 (hereafter CEQA Guidelines).) The CEQA Guidelines are essentially CEQA's regulations.

We may be brief here. Part 6 of the 2004 Final Staff Report concludes with a section entitled "CEQA Summary" (Final Staff Rep. for the Salt/Boron TMDL Amendment, *supra*, pp. 106–108). We encourage River Exchange to read it.

### G. Growth-inducing Impacts of Salt/Boron TMDL Amendment

River Exchange contends that the Salt/Boron TMDL Amendment fails to describe the growth-inducing impacts of the project, in contravention of CEQA Guidelines section 15126, subdivision (d), and a bevy of CEQA statutes.

Again, we beg to differ. The Final Staff Report for this TMDL states that "[i]mplementation of the proposed [Salt/Boron TMDL] Amendment would not directly or indirectly induce population growth in the area, displace existing housing, or displace people." This conclusion seems reasonable in light of the nature of the Salt/Boron TMDL Amendment: controlling agricultural-based salt discharge to a river segment.

Alas, it is now River Exchange that begs to differ. It postulates that the TMDL may make farming uneconomical or the soil unproductive, or require a treatment plant expansion. All of these consequences would render the land more suitable for residential development. But, because these are just postulations, they are flights of fancy rather than facts in the record to which our review is confined.

### H. Alleged Failure to Describe Salt/Boron TMDL Amendment Impacts Found Not to Be Significant

CEQA Guidelines section 15128 provides, in part: "An EIR shall contain a statement briefly indicating the reasons that various possible significant effects of a project were determined not to be significant and were therefore not discussed in detail in the EIR." River Exchange claims the Final Staff Report for the Salt/Boron TMDL Amendment contravened this guideline because the report neither discussed in detail the three potentially significant impacts to biological resources nor stated why these impacts were determined not to be significant.

River Exchange's claim, however, has it just backwards. The impacts to three biological resources (certain species, riparian habitat, and wetland protection) were deemed potentially significant; they were discussed in detail in the Final Staff Report; and a statement of overriding considerations outweighing them was adopted.[4]

## VI. CEQA Issues: DO Amendment

### A. *DO Amendment's Project Description*

River Group asserts that the "Final Staff Report for the DO Amendment"[5] violates CEQA by failing to adequately describe the project setting in two respects.

First, River Group argues that, in support of the fact of reduced river flow at Vernalis and consequent reduced oxygen in the Ship Channel, the Final Staff Report for the DO Amendment relies on an outdated 1980 study from the Water and Power Resources Service that analyzed data up to 1969 only—i.e., before the 1995 Bay-Delta Plan, the 1999 Water Right Decision 1641, and the construction of New Melones Dam, all of which created or mandated greater flow at Vernalis.

The Final Staff Report for the DO Amendment, however, relies not simply on this allegedly outdated 1980 study for the fact of reduced Vernalis flow, but also on a study from 1997 (U.S. Geological Survey) and another from 2002 (Oppenheimer and Grober).

According to River Group's second point, it is flow in the Ship Channel rather than flow at Vernalis that is the relevant factor for DO in any event.

As for this point, the San Joaquin River flow at Vernalis is what flows into the Ship Channel and from a relatively short distance (with intervening diversion to the California State Water Project and the Central Valley Project pumps near Tracy). In asserting the irrelevancy of the Vernalis flow, then, River Group simply fails to go with the flow.

---

[4] Because we have found the Final Staff Report for the Salt/Boron TMDL Amendment to be an EIR equivalent, we need not consider River Exchange's argument that if that report is deemed a negative declaration, it improperly defers environmental analysis under the guise of "tiering" environmental review.

[5] See Final Staff Report for the DO Amendment, February 28, 2005, entitled "California Environmental Protection Agency, Regional Water Quality Control Board, Central Valley Region, Amendments to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins for the Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel."

For its part, River Exchange argues that the Final Staff Report fails to note the federal government's responsibility for setting the Ship Channel's geometry (depth and width), and for mitigating that configuration's contribution to DO impairment under section 401 of the federal Clean Water Act. (33 U.S.C. § 1341.) We have already rejected this contention in a previous part of this opinion, to which we direct the reader: part III. of the Discussion ("Water Law Issues: DO Amendment") (see pp. 1124–1125, *ante*).[6]

## B. Deferring Environmental Review Under DO Amendment

River Exchange and River Group contend that the DO Amendment impermissibly defers environmental impact analysis under the guise of studies. We disagree.

As the trial court found, supported by the record, "[t]he initial phase of the DO [Amendment] control program [requiring only studies] establishes no new [TMDL] [wasteload] and load allocations, prohibitions or other limitations on discharges of oxygen[-]demanding substances . . . . Upon completion of the requisite studies [of DO-impairment factor of oxygen-demanding substances], the TMDL allocations and conditional prohibition [on discharge; prohibition applicable presently only if studies are not done] will be reconsidered and their environmental impacts will be fully reviewed under CEQA in proceedings [scheduled for] December 2009 on another Basin Plan amendment."

This situation stands in marked contrast to the one deemed improper in *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 [248 Cal.Rptr. 352], upon which River Exchange relies. In *Sundstrom*, the lead agency under CEQA, in proceeding under a negative declaration, "had determined, before the required studies were even performed, that the project would not have a significant impact on the environment." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028 [280 Cal.Rptr. 478] [characterizing *Sundstrom*].)

For these same reasons, the DO Amendment's Final Staff Report cannot be considered a negative declaration that improperly defers analysis of environmental impacts, as River Exchange and River Group contend. Again, the studies required by the DO Amendment do not have environmental impacts;

---

[6] River Exchange also contends, in a heading in its brief that is not discussed in any text, that the Final Staff Report for the DO Amendment incorrectly describes the no-project alternative. There is no such alternative to the DO Amendment, which requires, at this point, only studies of oxygen-demanding substances.

and before any projects, based on those studies, are approved for the DO conditions in the Ship Channel, those projects will be environmentally analyzed under CEQA.

Also, for these same reasons, we reject River Exchange's contention that substantial evidence in the record supports a fair argument that the DO Amendment may have substantial effects on the environment, and therefore the DO Amendment requires the functional equivalent of an EIR rather than a negative declaration.

Finally, for these same reasons, we reject River Group's assertions that the DO Amendment did not evaluate the potential environmental impacts of DO-enhancement projects such as mechanical aeration or obtaining water sources to increase river flow.

## VII. CEQA and Related Issues: Salt/Boron TMDL and DO Amendments

### A. *Failure to Analyze Cumulative Impacts—These Two Measures Allegedly Conflict*

River Exchange claims the Boards "failed to analyze" the cumulative impacts of implementing both the Salt/Boron TMDL Amendment and the DO Amendment, which allegedly conflict: The Salt/Boron TMDL Amendment contemplates reducing drainage to reduce salt discharges, while the DO Amendment contemplates increasing drainage to increase DO levels.

We fail to see a "failure to analyze." The State Board summarized the "[t]echnical [c]onsiderations" of this issue after noting the concern expressed about it at the October 20, 2005 State Board hearing on the Salt/Boron TMDL Amendment and DO Amendment. The State Board said:

"The Basin Plan Amendment that implements the [salt/boron] TMDL has explicit language that encourages the release of high quality water that would improve conditions for both salt and [DO]. Furthermore, many of the upstream sources of salt loads that would be reduced as a result of implementing [the salt/boron TMDL] will also likely reduce loads of oxygen[-]demanding substances and their precursors, thereby offsetting whatever negative impact there is of reducing flow. Not all sources of flow are equal.

"Additionally, the main Regional Board focus on reduced [Ship Channel] flow during the irrigation season is on the diversion of water at the [h]ead of Old River to the State and Federal pumping projects [i.e., California State Water Project and Central Valley Project]. The impact of any reduction in

flow in the [San Joaquin River] upstream of Vernalis that may (or may not) result from salt source controls, will likely be much less significant than these diversions at the head of Old River [the head of Old River lies between Vernalis and the Ship Channel]. Furthermore, as has been pointed out by [River Group] comments, there tends to be more flow now than in the past in the San Joaquin River during the irrigation season due to reservoir operations."

Both Boards made similar analyses throughout the Basin Plan amendment process for the salt/boron TMDL and the DO impairment.

### B. Public Participation and Consultation

River Exchange contends the State Board violated CEQA, the CEQA Guidelines, and its own regulations by unreasonably limiting comments from interested parties.

Under the applicable CEQA statute, the in-lieu written environmental documentation required of a certified regulatory program, such as the Basin Plan process here, must be "available for a reasonable time for review and comment by other public agencies and the general public." (§ 21080.5, subd. (d)(3)(B).)

That standard was certainly met here with respect to both the Salt/Boron TMDL Amendment and the DO Amendment. For example, eight public workshops were held between August 2000 and April 2004 concerning the Salt/Boron TMDL Amendment. These workshops included initial outreach to inform stakeholders that this TMDL was being started; continuous updates to explain the methods and assumptions used to develop the TMDL; and public input regarding this TMDL's development. The draft Salt/Boron TMDL Amendment was revised several times in response to public comment. The record shows a similar process for the DO Amendment.

River Exchange complains of two limitations on comments. The first limitation involved the October 20, 2005 State Board hearing where the agenda stated, "Comments shall be limited to the changes from the draft resolution considered at the October 5, 2005 Workshop" and "Presentations at the Public Forum [part of this hearing] will be limited to [five] minutes or otherwise at the discretion of the Chairman." (Italics omitted.) The second limitation involved the State Board's reopening for public comment after the Regional Board adopted both amendments (after extensive public comment there); that limitation stated, "Written comments [not to exceed 10 pages] should be limited to new information obtained since [the Regional Board's] adoption of the amendments."

These limitations were reasonable. Otherwise, the wheel would have been reinvented on each occasion. The public bureaucratic slog here was a typically exhaustive one during which due process was afforded.

River Exchange also contends the Boards failed to engage in consultation and disclose the persons and organizations consulted during the environmental review process.

■ The applicable regulation for a certified regulatory program states only that, upon completion of the in-lieu environmental analysis, the relevant board "shall consult with other public agencies having jurisdiction" and "should consult with persons having special expertise." (Cal. Code Regs., tit. 23, § 3778.) Both the Salt/Boron TMDL Amendment and the DO Amendment stated that "[a]gency consultation shall occur when this staff report is circulated for public review and comment." We presume official duty has been performed unless the record affirmatively shows otherwise; the record here does not show otherwise. (Evid. Code, § 664; see *Small v. Superior Court* (2007) 148 Cal.App.4th 222, 236–237 [55 Cal.Rptr.3d 410].)

### C. Economic Analysis and State-mandated Cost

River Exchange contends the Boards (1) failed to identify "potential sources of financing" prior to implementing a water quality control program, in violation of Water Code section 13141, and (2) violated the state constitutional prohibition on mandates by requiring local agencies to pay for state-mandated costs (Cal. Const., art. XIII B, § 6).

■ As for contention No. (1) involving Water Code section 13141, River Exchange does not dispute the Boards' point that River Exchange did not raise this argument in the trial court until its reply brief. Furthermore, River Exchange has forfeited this argument on appeal by failing to separately head it. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

■ Finally, as for contention No. (2) on state-mandated costs, the trial court properly noted that it lacked jurisdiction to consider this argument. Pursuant to statute, a comprehensive administrative procedure constitutes the exclusive process by which a local agency may claim reimbursement for such costs. (Gov. Code, § 17500 et seq.; *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 333 [285 Cal.Rptr. 66, 814 P.2d 1308].)

## DISPOSITION

The judgment is affirmed. Respondent Boards are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Raye, Acting P. J., and Robie, J., concurred.

On May 5, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 30, 2010, S182632.