Filed 5/7/14  Living Rivers Council v. State Water Res. Control Bd. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LIVING RIVERS COUNCIL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STATE WATER RESOURCES CONTROL BOARD,<br><br>        Defendant and Respondent. | A137082<br><br>(Alameda County<br>Super. Ct. No. RG11560171) |

Living Rivers Council (LRC) appeals from the Alameda County Superior Court's judgment denying its petition for a peremptory writ of mandate.  LRC sought a writ ordering the State Water Resources Control Board (State Board) to void its approval of an amendment to the Water Quality Control Plan for the San Francisco County Basin (Basin Plan Amendment or Plan) regarding the deposition of sediment into the Napa River, located in Napa County, California.  LRC contends the Plan does not comply with requirements in the California Environmental Quality Act, Public Resources Code sections 21000 et seq. (CEQA).

For more than 20 years, the State Board and the San Francisco Bay Region Water Control Board (Regional Board) have been concerned about the impact on water quality of the deposition of sediment from anthropogenic sources into the Napa River and its tributaries.  In October 2010, the State Board approved the Basin Plan Amendment, as recommended by the Regional Board, after extensive research and public participation, which included numerous comments on draft reports and at public hearings by LRC.  The

1

Basin Plan Amendment establishes numeric targets for the deposition of sediment into the Napa River, including a required 51 percent reduction in sediment from various sources, such as vineyards, and a total maximum daily load (TMDL) for sediment equal to 125 percent of natural background.

LRC does not challenge the need for these numeric targets. Rather, it sought a writ of mandate challenging various alleged deficiencies based upon activities LRC says are required under CEQA in order for the Plan to be properly adopted. After careful review of the extensive administrative record before the Regional Board and the State Board, including a two year technical study prepared in 1990, public comments on various staff reports and an earlier draft of the basin plan amendment, and staff responses to extensive comments submitted by LRC, among others, the trial court rejected LRC's arguments.

On appeal, LRC argues the State Board's environmental documentation, which by law it is allowed to substitute for an environmental impact report (substitute environmental documentation, or SED), is inadequate in three ways. First, the SED does not include a sufficient review of the environmental impact of certain Napa County Conservation regulations (County regulations), which, LRC contends, the Plan sets as a compliance standard for such matters as storm runoff from new hillside vineyards; second, the SED does not sufficiently describe and evaluate a feasible mitigation measure for controlling increases in such storm runoff, and improperly defers identification of such measures to a later time; and third, the SED impermissibly defers to a future time, or "piecemeals," the environmental impact review of the State Board's purported policy of waiving "waste discharge requirements," (WDRs) which, LRC contends, is an integral part of the Plan, and, therefore, must be reviewed in the SED. The State Board disagrees on all counts.

After careful review, we conclude that LRC's arguments lack merit. Therefore, we affirm.

# BACKGROUND

Since the late 1940's, populations of steelhead and salmon in the Napa River and its tributaries have declined substantially. Sediment from various human activities, including livestock grazing and conversion of native lands to vineyards in more and more of the Napa River watershed, is thought to contribute to that decline.

In 1990, the Regional Board, acting pursuant to the federal Clean Water Act (the Clean Water Act) (33 U.S.C. § 1251 et seq.), listed the Napa River as impaired by sedimentation. The Clean Water Act "places primary reliance for developing water quality standards on the states (termed 'water quality objectives' in California)." (*San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1115 (*San Joaquin River*).) It "focuses on two possible sources of pollution: . . . 'Point' sources refer to discrete discharges, such as from a pipe. [Citation.] 'Nonpoint' refers to everything else, including agricultural runoff." (*Ibid.*) " 'California implements the Clean Water Act through the Porter–Cologne [Water Quality Control] Act (Wat. Code, § 13000 et seq.),' " under which " '[r]egional boards must formulate and adopt water quality control plans, commonly called basin plans[.]' " (*Id.* at pp. 1115-1116.)

"When the Clean Water Act's permit program, applicable to point sources, fails to clean up a river or river segment, states are required to identify such waters and list them in order of priority. Based on that listing . . . [citation], states are to calculate levels of permissible pollution in TMDL's . . . . [Citation.]

"A TMDL defines the maximum amount of a pollutant that can be discharged or 'loaded' into the relevant water segment from all sources. A TMDL must be established at a level that will implement the applicable water quality objective. [Citation.] A TMDL is comprised of a 'wasteload allocation' that applies to point sources, a 'load allocation' that applies to nonpoint sources, and a 'margin of safety' to account for any lack of knowledge concerning the relationship between the pollutant and water quality." (*San Joaquin River, supra,* 183 Cal.App.4th at p. 1115, quoting *City of Arcadia v. State*

*Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1404-1405 (*City of Arcadia*).)

The Regional Board was thus required to establish a TMDL for sediment in the Napa River. After five years of field studies, draft reports, public hearings, and receipt of extensive public comments and written responses to them, it adopted the Basin Plan Amendment in September 2009. Among other things, this Plan established a TMDL for sediment in the Napa River intended to reduce it from 185 percent to 125 percent of the natural background; set wasteload and load allocations needed to achieve this TMDL for various point and non-point sources of sediment, including drainage runoff from vineyards caused by storms; and included a plan to implement the TMDL. A 155-page State Board staff report was prepared, which contains a 40-page environmental checklist, a discussion of potentially significant environmental impacts, alternatives to, and benefits of, the plan, and a lengthy summary of comments received on the proposed amendment, including from LRC, and responses thereto. It also incorporates by reference several lengthy responses made by the Regional Board staff to earlier, substantially identical, comments. The State Board relied on this SED, rather than an environmental impact report (EIR), to make its determinations. In October 2010, it approved the Basin Plan Amendment.

LRC filed a petition for writ of mandate and complaint for declaratory relief in February 2011. The court heard the matter and issued its final statement of decision in August 2012, denying the petition, and entered judgment in September 2012. LRC filed a timely notice of appeal.

## DISCUSSION

### I. *Relevant Law*

**A. *CEQA Requirements for the State's Basin Planning Process***

In order to assess LRC's claims of deficiencies in the State Board's SED, we must first discuss what CEQA requires for the basin planning process of "certified" agencies such as the State Board and Regional Board.

" 'CEQA compels government first to identify the environmental effects of projects, and then to mitigate those adverse effects through the imposition of feasible mitigation measures or through the selection of feasible alternatives.' [Citation.] CEQA mandates that public agencies refrain from approving projects with significant environmental effects if there are feasible alternatives or mitigation measures that can substantially lessen or avoid those effects. [Citation.]

"CEQA is implemented through initial studies, negative declarations and EIR's. [Citation.] 'CEQA requires a governmental agency [to] prepare an [EIR] whenever it considers approval of a proposed project that "*may* have a *significant* effect on the environment." ' [Citation.] 'If there is no substantial evidence a project "may have a significant effect on the environment" or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. [Citations.] However, the Supreme Court has recognized that CEQA requires the preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." [Citations.] Thus, if substantial evidence in the record supports a "fair argument" that significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified.' [Citation.]

" ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant.' (Cal. Code Regs., tit. 14, § 15382.)" (*City of Arcadia*, *supra*, 135 Cal.App.4th at pp. 1420-1421.)

State regulatory programs that meet certain environmental standards and are certified by the Secretary of the California Resources Agency are exempt from CEQA's

requirements for preparation of EIRs, negative declarations, and initial studies. (*City of Arcadia, supra,* 135 Cal.App.4th at p. 1421.) "The basin planning process of the State Board and regional boards is a certified regulatory program (Cal. Code Regs., tit. 14, § 15251, subd. (g)), and the regulations implementing the program appear in the California Code of Regulations, title 23, sections 3775 to 3782." (*Id*. at pp. 1422-1423.)

"Environmental review documents prepared by certified programs may be used instead of environmental documents that CEQA would otherwise require. [Citations.] . . . [Citations.] Documents prepared by certified programs are considered the 'functional equivalent' of documents CEQA would otherwise require. [Citations.] [¶] . . . [¶] The guidelines for implementation of CEQA [citation] do not directly apply to a certified regulatory program's environmental document. [Citation.] However, '[w]hen conducting its environmental review and preparing its documentation, a certified regulatory program is subject to the broad policy goals and substantive standards of CEQA.' [Citation.] [¶] In a certified program, an environmental document used as a substitute for an EIR [such as the SED in this case] must include '[a]lternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment[.]' (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A)(B).)" (*City of Arcadia, supra,* 135 Cal.App.4th at pp. 1421-1422.) "A regional board's submission of a plan for State Board approval must be accompanied by a brief description of the proposed activity, a completed environmental checklist prescribed by the State Board, and a written report addressing reasonable alternatives to the proposed activity and mitigation measures to minimize any significant adverse environmental impacts." (*Id*. at p. 1423, citing Cal. Code Regs., tit. 23, § 3777, subd. (a).)[1]

## B. *Courts' Application of These CEQA Requirements*

Two leading cases, in which appellate courts reached opposite conclusions, show how CEQA has been applied to the State Board's environmental reviews in different

---

[1] LRC does not argue that any of these required elements is missing from the SED.

6

circumstances. In *City of Arcadia, supra,* 135 Cal.App.4th 1392, the State Board's process in adopting a TMDL regarding trash (Trash TMDL) was held to be deficient. The Board adopted a zero Trash TMDL with a multi-year implementation period for litter discharged from municipal storm drains into the Los Angeles River estuary. The appellate court focused on the Board's failure to address altogether "the temporary impacts of the construction of [anticipated ] pollution controls, which logically may result in soils disruptions and displacements, an increase in noise levels and changes in traffic circulation," as well as "the effects of increased street sweeping on air quality and possible impacts caused by maintenance of catch basin inserts, [vortex separation system (VSS)] units and other compliance methods." (*Id.* at p. 1425.) Because evidence of such environmental consequences had been introduced in the administrative proceedings, albeit by municipalities complaining about the expense of the proposed Trash TMDL, it was improper for the State Board to ignore that evidence. Under CEQA, "a public agency must explain the reasons for its actions to afford the public and other agencies a meaningful opportunity to participate in the environmental review process, and to hold it accountable for its actions." (*City of Arcadia*, at p. 1426.) In other words, substantial evidence had raised "a fair argument the Trash TMDL may have significant impacts on the environment," requiring remand so that an EIR, a tiered EIR, or the functional equivalent would be prepared. (*Ibid.*) The court rejected the State Board's argument that the environmental impact issues raised were based on "speculative possibilities" that did not need to be studied, finding instead that "the Trash TMDL sets forth various compliance methods, the general impacts of which are reasonably foreseeable but not discussed." (*Ibid.*)

On the other hand, in *San Joaquin River, supra,* 183 Cal.App.4th 1110, the appellate court found a TMDL *was* based upon a sufficient environmental impact review, contained in a final staff report. There, the State Board adopted a "Salt/Boron TMDL Amendment" to restrict agricultural discharges from facilities into the lower San Joaquin River. The court rejected the contention that the final staff report was inadequate, as had been established about the documentation in *City of Arcadia*. The *San Joaquin River*

7

court noted that the documentation in *City of Arcadia* was more like a negative declaration than a fully developed EIR, unlike the more extensive staff report before it. (*San Joaquin River*, at pp. 1127-1128.) Also, unlike in *City of Arcadia*, "the compliance methods here, at this point, are indeed ' "speculative possibilities." ' " (*San Joaquin River*, at p. 1128.) The court concluded that a CEQA analysis could not reasonably be performed until further decisions about methods and infrastructure were made by dischargers who would apply for facility permits in the future. (*San Joaquin River*, at p. 1128.)

## C. *Our Standard of Review*

Recognizing that this case presents the issue of the adequacy of an SED, and not an EIR, our standard of review is that set forth by our Supreme Court in *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 (*Vineyard Area Citizens*):

"[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]

"In evaluating an EIR for CEQA compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, we held the agency 'failed to proceed in the manner prescribed by CEQA.' [Citations.] In contrast,

8

in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435.)

## II. *The Basin Plan Amendment and SED Adequately Address Vineyard Runoff*

LRC first argues, in essence, that the State Board violated CEQA by incorporating into its Basin Plan Amendment a compliance standard based upon the County regulations without adequately evaluating the regulations' environmental impact in its SED. We disagree.

The County regulations, which LRC has criticized for 13 years, permit installation of engineered drainage facilities in new hillside vineyards. LRC asserts that, while these facilities may help avoid surface runoff, they also may concentrate water runoff, particularly during heavy storms, and deliver it, with sediment, to the tributaries of the Napa River with such force that it increases the rate of stream bed incision and erosion of the river banks. This increased incision and erosion leads to deleterious effects on fish habitat and other potentially significant environmental impacts. LRC argues that, because the State Board adopted the County regulations as a means of Plan compliance and LRC presented evidence that engineered drainage facilities permitted by these regulations cause environmental problems, the State Board was required to, but did not, conduct a full EIR-level review of the County regulations, like the one required in *City of Arcadia* with respect to installation and maintenance of catch basin inserts and VSS units in storm drains.

The State Board does not dispute that engineered drainage facilities can have such a deleterious effect on the river and its tributaries. Rather, it argues LRC's "insufficient evaluation" argument lacks merit because the Plan and SED do *not* adopt the County regulations as a means of compliance by itself with the TMDL, but instead refers to them as effective in controlling the delivery of excessive sediment resulting from vineyard surface erosion. Moreover, to the extent anything stated in the Plan implied that following these regulations aided a vineyard owner's or operator's ability to comply with the TDML and the Plan's performance standards, the use of permitted engineered

9

drainage facilities was one of several possible methods discussed. Therefore, the regulations' environmental impact need not be further studied.

Also, the State Board asserts, the SED sufficiently evaluates vineyard drainage, along with the other identified sources of sediment in the river, as it includes extensive commentary on the issue, including the potential exacerbation of the problem by County regulations-permitted engineered drainage facilities on hillside vineyards. The State Board and Regional Board staffs did extensive analyses of the potential environmental impacts caused by requiring compliance with the 125 percent of background TMDL, and the Water Board adopted additional performance standards intended to avoid or mitigate those impacts. The State Board argues that *City of Arcadia* is inapposite, therefore, because in that case, the State Board performed only the equivalent of a negative declaration in the face of evidence of significant environmental impact from the only effective means of compliance.

We agree with the trial court and the State Board that the Plan's reference to the County regulations does not constitute their adoption as a means of compliance with the TMDL. LRC focuses on a reference to the County regulations contained in footnote 5 of Table 4.1 of the 20-page Plan. To understand that footnote, we must examine it in context.

The Plan begins with a statement of goals, which include conservation and enhancement of the fish communities, and enhancement of the aesthetic and recreational values of the river and its tributaries. It identifies the specified actions needed to achieve these goals, which include actions to "[a]ttain and maintain suitable gravel quality and diverse streambed topography in freshwater reaches of Napa River and its tributaries" and "[p]rotect and/or enhance base flows in tributaries and the mainstem of the Napa River."

The Plan also identifies the problems, which include "high concentrations of fine sediment," channel incision, and the fact that, "[d]ue to excess erosion and sedimentation in the Napa River watershed, the narrative water quality objectives for sediment and settleable material are not being met . . . ." According to the Plan, more than half of fine

10

sediment delivered to Napa River from 1994 to 2004 was associated with land use activities, coming from such sources as human-caused channel incision and associated bank erosion, and "gullies and shallow landslides associated with vineyards, and/or intensive historical grazing."

The Plan then describes the implementation plan and regulatory tools needed to "achieve TMDL targets and allocations and habitat enhancement goals by September 2029." With respect to nonpoint source discharges, including those from vineyards, the Plan states: "The state's Policy for Implementation and Enforcement of the Nonpoint Source Pollution Control Program requires regulation of nonpoint source discharges using the Water Board's administrative permitting authorities, including [WDRs], waiver of WDRs, Basin Plan Discharge Prohibitions, or some combination of these. Consistent with this policy, Tables 4.1 - 4.4 specify actions and performance standards by nonpoint source category, as needed to achieve TMDL sediment targets and allocations in Napa River watershed."

Table 4.1 focuses on vineyards. It sets forth the following performance standards:

"**Surface Erosion associated with vineyards:** Control excessive rates of sediment delivery to channels resulting from vineyard surface erosion; **and**

"**Roads:** Road-related sediment delivery to channels ≤ 500 cubic yards per mile per 20-year period; **and**

"**Gullies and/or shallow landslides:** Accelerate natural recovery and prevent human-caused increases in sediment delivery from unstable areas; **and**

"**Effectively attenuate significant increases in storm run off**, so that the runoff from vineyards shall not cause or contribute to downstream increases in rates of bank or bed erosion." (Fns. omitted.)

Table 4.1 further states that vineyard owners and operators should take the following actions to achieve these performance standards: "Submit a Report of Waste Discharge (RoWD) to the Water Board that provides, at a minimum . . . a description of the vineyard[,] identification of site-specific erosion control measures needed to achieve performance standard(s) specified in this table[,] and a schedule for implementation of

11

identified erosion control measures"; or "[d]evelop and begin implementing a farm plan certified under Fish Friendly Farming Environmental Certification Program or other farm plan certification program, approved as part of a waiver of WDRs. All dischargers applying for coverage under a waiver of WDRs also will be required to file a notice of intent (NOI) for coverage, and to comply with all conditions of the WDR waiver." (Fns. omitted.) The table also states that vineyard owners and operators should "[c]omply with all applicable [WDRs] or waiver of WDRs" and "[r]eport progress on implementation of site specific erosion control measures."

As indicated above, footnote 5 in Table 4.1 appears at the end of the statement of the "surface erosion" performance standard. It states in its entirety: "Napa County Conservation Regulations (County Code, Chapter 18.108) are effective in the control of excessive rates of sediment delivery resulting from vineyard surface erosion. Rates of sediment delivery are 'excessive' when the predicted soil loss rate exceeds the tolerable soil loss rate (T), calculations described in 'The Universal Soil Loss Equation, Special Applications for Napa County, California' (USDA, 1994)."

LRC argues footnote 5 constitutes adoption of the County regulations as a compliance standard, thereby requiring an EIR-level analysis of these regulations. To support this argument, it emphasizes that an earlier version of the "surface erosion" performance standard in Table 4.1 provided in relevant part: "Comply with conservation regulations (County Code, Chapter 18.108)" But this prior draft standard was replaced with the standard we have quoted above, which was contained in the Regional Board's later recommendation to the State Board, and is in the Amended Basin Plan. Thus, the Plan does not contain any reference to the County regulations, other than the comment on their effectiveness in footnote 5. LRC's attempt to construe footnote 5 as adopting a legal standard in the face of this critical revision is, at best, misguided.

LRC also takes out of context a snippet of testimony from a Regional Board staff environmental scientist, Mike Napolitano, before the Regional Board in September 2009 to contend that efforts to comply with the County regulations have caused a serious problem with increased runoff from engineered drainage facilities on hillside vineyards.

12

We quote Napolitano's testimony at length here, with the snippet quoted by LRC in italics: "I think, first of all, in terms of we have not done anything other than acknowledge that the [County regulations] exist, that they are in place. We do find that they are effective in controlling surface erosion on site and we also find, from having been out—I think I have been out to 86 vineyards now, over 10,000 acres, that the methods and means that are used to control surface erosion are not monolithic and they are not unchanging in time. *In some cases, the methods that have been used have definitely increased the flow of runoff off-site and have led to local gulling at the site of discharge, and we have noted that as a significant source in our sediment budget analysis.* It was one of the reasons that we added a performance standard." (Italics added.) Thus, Napolitano actually indicated the Plan's reference to the County regulations did not establish a compliance standard, that efforts to comply with these regulations had led to mixed results, and that these problems were one reason for adopting a new performance standard. This supports the Water Board's position more than LRC's.

LRC also points to a comment in the State Board's staff report that " '[t]he Basin Plan [A]mendment relies on landowner compliance with [the County regulations] to achieve sediment allocations for vineyard surface erosion.' " However, LRC ignores the testimony of Napolitano, which places this analysis in its proper, more limited context. LRC also ignores the State Board staff's extensive formal response to the comment on this subject by LRC's Thomas N. Lippe, which expressly states that the County regulations are neither a performance standard nor a mitigation measure, but simply helpful in achieving the TMDL.[2]

---

[2] The staff response states: "Commenter incorrectly states that '[t]he TMDL adopts, as a performance standard for controlling surface erosion from vineyards, Napa County's enforcement of [the County regulations] on new vineyard conversions.' The TMDL does not adopt the program as a performance standard or as a mitigation measure for the TMDL; it simply acknowledges the existence of the program as one program that may be helpful for achieving the TMDL. The [County regulations] are not referenced as a mitigation measure to reduce potential impacts from the TMDL; the County's program

13

In short, reviewing the matter de novo, we agree with the trial court that the State Board did not, as LRC argues, adopt the County regulations as a compliance standard regarding vineyard surface erosion control in the Basin Plan Amendment. Further, to the extent that LRC disagrees with the State Board's conclusion that the County regulations are effective, there is substantial evidence in the administrative record to support this conclusion, as indicated by Napolitano's testimony, for example.

We also agree with the State Board that the SED sufficiently evaluated vineyard drainage, as indicated by the extensive analyses referred to by the State Board. LRC's reliance on *City of Arcadia* is thus misplaced. Nothing in the SED indicates that installation of the engineered drainage facilities highlighted by LRC is necessary or sufficient to comply with the TMDL. In *City of Arcadia*, negative environmental effects were reasonably anticipated from the *necessary* installation of catch basin inserts and VSS units, which were anticipated to be the only effective means of meeting the Trash TMDL. (*City of Arcadia, supra,* 135 Cal.App.4th at p. 1425.) Here, on the other hand, Table 11a of the Environmental Checklist, prepared by the State Board's staff prior to adopting of the Basin Plan Amendment, identifies six "reasonably foreseeable compliance action(s)" which might address peak flow attenuation, only one of which involves engineered drainage. And that reference is only to "[r]educe/disconnect engineered drainage," which, "at a minimum," would require permitting through "WDR or conditional waiver." Given the number of reasonably foreseeable means vineyard

---

does not address any of the potential adverse impacts that will result from adoption of the TMDL. The TMDL does not in any way approve the creation or operation of vineyards. The TMDL establishes a program to ensure that if discharges occur from the creation or operation of vineyards, they occur in a manner that ensures that water quality objectives will be met. [¶] To the extent that there may be impacts from the adoption of the TMDL, those impacts would result from the construction and/or operation of reasonably foreseeable methods of compliance with the TMDL, not from the operation or construction of vineyards themselves. The TMDL merely dictates that when vineyards are built or operated they must include methods to ensure that increases in the discharge of sediment do not occur."

owners could choose in the future to comply with the performance standard for avoiding runoff, this case is much more like *San Joaquin River* than *City of Arcadia*.

Finally, unlike in *City of Arcadia,* in this case the State Board did not ignore evidence that use of engineered drainage facilities could have a negative impact. To the contrary, it acknowledged that potential negative impact, implemented an "effectively attenuate" performance standard to address the use of such facilities, discussed further, *post*, and identified feasible alternatives which vineyard owners could consider to meet the performance standard. For all of these reasons, we agree with the trial court that nothing more was required of the State Board with respect to the County regulations.

**III.** ***Because the SED is a Planning Level "Project," its Description of the Performance Standard For Controlling Increases in Vineyard Runoff is Adequate.***

As we have indicated, one of the performance standards in Table 4.1 of the Plan states, "**Effectively attenuate significant increases in storm run off**, so that the runoff from vineyards shall not cause or contribute to downstream increases in rates of bank or bed erosion." LRC argues this standard actually is a mitigation measure that is not sufficiently described and evaluated in the SED nor feasible, and that the Plan improperly defers "identification of whether and how mitigation will be achieved" to a later time.

The State Board responds that this performance standard is a mitigation measure only to the limited extent that it addresses using newly-approved engineered drainage facilities for vineyard runoff, which, as discussed *ante*, is only one of several foreseeable compliance methods referred to in the Plan and is clearly disfavored. Further, this is a qualitative performance standard, and does not need to contain a quantitative requirement. The State Board is allowed by law to implement it through the Regional Board's ability to grant, or not to grant, conditional permits regarding WDRs, or waivers, for specific projects as presented in the future, which will require additional CEQA review and monitoring of the effectiveness of any conditions imposed. Also, the record indicates implementation of this standard is feasible, and that the State Board may best measure compliance through monitoring and measurement of any actual changes in

15

stream bed incision and bank erosion caused by any such engineered drainage devices, rather than adopting a numerical proxy which itself would have a large margin of error.

We agree with the State Board. We find no violation of law or abuse of discretion by the State Board regarding this "effectively attenuate" performance standard/mitigation measure.

The "effectively attenuate" statement, whether viewed as a performance standard or a mitigation measure, is neither inadequately described nor an improper deferral of the identification of a mitigation measure to a later date. To the contrary, it is consistent with the State CEQA Guidelines (Guidelines).[3] The Guidelines make clear that, "[w]here a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographical scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (Cal. Code Regs., tit. 14, § 15152, subd. (c); see also § 15385 [definition of "tiering"] and § 15168 ["[a] program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related . . . [¶] . . . [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program"].)

To the extent that these provisions of the Guidelines apply to a Plan adopted by a certified regulatory agency, the Basin Plan Amendment is like a general plan or a program EIR. The SED here identifies a potential negative effect not of the Plan, but of one of several foreseeable methods that can be employed in efforts to comply with the TMDL—the use of engineered drainage facilities. However, for the reasons discussed above, the State Board cannot further evaluate whether a specific request regarding a

---

[3] The State CEQA Guidelines are contained in California Code of Regulations, title 14, section 1500 et seq.

16

WDR or a conditional waiver is appropriate until an operator of a vineyard makes such a request. At that time, a separate CEQA analysis will be performed, as contemplated by California Code of Regulations, title 14, section 15152, subdivision (c). For now, the performance standard has been clearly set out in Table 4.1. It can be met by the Regional Board setting conditions for WDRs or waiver of WDRs,[4] and then, as the Regional Board plans to do, by monitoring the activities of vineyard owners and operators to assure compliance.[5] As the trial court concluded, citing *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, "the development of attenuation standards with a greater level of detail and the application of those standards in individual locations can be left for further agency action."

With respect to the feasibility of achieving this "effectively attenuate" performance standard, Table 11a of the Environmental Checklist included in the SED identifies six reasonably foreseeable compliance actions, including "reduce/disconnect engineered drainage." LRC has cited no evidence in the record that suggests any of these methods of attenuating peak flows from vineyards is not feasible. On the other hand,

---

[4] The waivers would be for up to five years. (Wat. Code, § 13269, subd. (a)(2).) The Regional Board could terminate them at any time and would not be required to renew them if it finds that particular vineyards have not been successful in meeting the standard.

[5] As the State Board staff further stated in its response to the comment by LRC's Thomas N. Lippe, discussed in footnote 2, *ante*: "Foreseeable methods of compliance may be BMPs, structures or devices that attenuate peak flow, or other methods. The potential impacts from reasonably foreseeable methods of compliance were analyzed by the [Regional] Board to the extent possible in this plan-level analysis. The Water Boards are precluded from specifying manner of compliance (Wat. Code, § 13360), so it could not perform project-level analyses on every project that will be designed in compliance with this TMDL. As individual projects are proposed, the permitting agencies, including the [Regional] Board, may have a better idea of the specific methods that will be incorporated into the projects, and, as a result, may better be able to focus more specific environmental review on those individual methods. At this point, however, the [Regional] Board appropriately analyzed reasonably foreseeable methods of compliance in the substitute environmental documentation . . . , as required by Public Resources Code section 21159, and analyzed potential mitigation measures, potential alternatives, and the costs involved."

17

Table 11a of the Environmental Checklist indicates there are several ways to address that problem that have been proven successful over the years, and which do not have negative consequences in terms of increased runoff associated with some engineered drainage facilities.  LRC fails to explain why anything more is required to establish feasibility. (*See California Native Plant Society*, *supra,* 172 Cal.App.4th at p. 622 ["[a] mitigation measure is feasible if it is 'capable of being accomplished in a successful manner within a reasonable period of time' "].)

LRC relies heavily on the decision of Division Four of this court in *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70 (*CBE*) for its arguments.  *CBE* is wholly inapposite here.  There, Chevron sought and, by a five to four vote of the Richmond City Council, received approval for extensive modifications to its Richmond facility intended to permit it greater flexibility in the grades of crude oil Chevron could process there.  Chevron's project description was found to be potentially misleading and at least inconsistent regarding whether Chevron intended to process more lower grade crude oil, which could generate more greenhouse gases than Chevron's then-current operations.  Furthermore, the City of Richmond was slow to acknowledge that Chevron's massive project would involve " 'estimated new emissions of 898,000 metric tons per year of GHGs [greenhouse gases] prior to mitigation [which] would most likely be a significant effect on the environment' "; mitigating that quantity of greenhouse gases was equivalent to taking 160,000 cars off the road.  (*Id*. at p. 91.)  Yet the EIR before the city council did not address how that mitigation was to be accomplished.  Rather, it provided that Chevron would have a year after approval of the EIR to present its proposal to the city, which would then review it, apparently without the benefit of a complete new EIR.

In contrast, here, the Basin Plan Amendment was proposed and adopted for the express purpose of reducing sediment in the Napa River by a state agency charged with doing so.  There is no challenge to the Plan except the three discussed in this opinion, and no suggestion that the Regional Board or the State Board has acted in less than the best of good faith in their compliance with CEQA.  The SED also described in some detail in the

State Board staff responses to LRC's comments on this point how the Regional Board will evaluate compliance.[6] Nothing in *CBE* suggests that the administering of WDRs or WDR waivers and monitoring of effectiveness by the public agency legally responsible for achieving the performance standards in the Plan is inadequate.

Indeed, the *CBE* court correctly stated the law that is directly applicable here: "Deferred selection of mitigation measures is permissible under the following circumstances: ' "[F]or kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . . , the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. . . ." ' " (*CBE*, *supra*, 184 Cal.App.4th at p. 94; see also *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1029.)

Similarly, in *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, the court upheld mitigation measures which set standards and committed agencies to future actions through " ' "identified measures that will mitigate those impacts," ' " noting that " ' "the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, . . . the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study." ' " (*Id.* at p. 629.)

---

[6] LRC contends these comments were provided too late for proper consideration. We disagree. They were provided to LRC and the public on October 1, 2010, in advance of the State Board's hearing on October 5, 2010. This was at the end of a lengthy period of providing information to the public and receiving its input before the State Board made its decision. LRC does not establish it lacked sufficient opportunity to review those responses before the hearing and express its views of them at the hearing.

The State Board did not violate any law or abuse its discretion in adopting this approach. Therefore, LRC's argument about the purported inadequacy of the "effectively attenuate" performance standard, or mitigation measure, lacks merit.

**IV. _The Basin Plan Amendment Does Not Improperly "Piecemeal" Review of the Project As a Whole_**

LRC's final argument is that the SED impermissibly defers to a future time, or "piecemeals," the environmental impact review of a State Board policy of waiving WDRs, albeit to be applied in the future, which, LRC contends, is an integral part of the Plan that must be reviewed in the SED. LRC argues it is "uncontradicted" that this waiver policy is already a part of the Plan. LRC is incorrect.

The record establishes only that the Regional Board _may_ adopt such a policy in the future. As the State Board staff stated, "[O]ne approach the [Regional] Board may use to implement the TMDL is to adopt a Waiver of WDRs, which will broadly regulate a specified category of discharges. At the time that mechanism is adopted, it will be subject to a more focused environmental review, specific to the types of discharges [it] regulates." This approach is reflected in footnote 2 of Table 4.1 of the Plan, which refers to conditional WDR waivers that "may" be adopted by the Regional Board.[7]

Furthermore, the SED makes clear that the State Board, when it adopted the TMDL, did not decide exactly how to regulate discharges in order to achieve it. Rather, the State Board, operating as a certified regulatory agency, followed the protocols in the Guidelines for adoption of the Plan as a program, with the intention to follow through with subsequent CEQA compliance when and if a waiver policy is adopted. As the State Board staff wrote in response to one of LRC's comments: "[T]he CEQA review that accompanies the TMDL is akin to a tiered EIR, which is programmatic in nature. Like a general plan EIR, the substitute environmental documentation that accompanies a TMDL looks at broad impacts of the plan, reasonably foreseeable methods of compliance, and

---

[7] The State Board's request for judicial notice, filed October 15, 2013, and LRC's second request, filed November 5, 2013, are both granted. However, neither changes our analysis.

20

impacts, mitigation measures and alternatives for those methods of compliance. The environmental documentation that accompanies a TMDL cannot be project specific because no projects have yet been proposed to meet the specific requirements of the TMDL. Project specific environmental review must await specific compliance projects that will be proposed by dischargers to comply with the TMDL. . . . The [Regional] Board's documentation contains just such an environmental review. It states that one approach the SF Bay Board may use to implement the TMDL is to adopt a Waiver of WDRs, which will broadly regulate a specified category of discharges. At the time that mechanism is adopted, it will be subject to a more focused environmental review, specific to the types of discharges [it] regulates. . . ."

The State Board's approach is consistent with the relevant case law. Cases which have disapproved application of a tiered approach have involved inadequate review of an actual specific project rather than a general plan. (See, e.g.: *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 (*Stanislaus Natural Heritage Project*) [no analysis of impacts of providing water from off-site for a planned residential facility that could not proceed without water]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 (*San Joaquin Raptor*) [no analysis of a contemplated sewer expansion that was a "crucial element" of a residential development project]; *City of Arcadia, supra,* 135 Cal.App.4th 1392 [no analysis of the environmental impacts of specified pollution control devices necessary to meet the zero trash TMDL].) Those cases have no application to this case.

On the other hand, as our Supreme Court held in *In re Bay-Delta Etc.* (2008) 43 Cal.4th 1143: "Under CEQA's tiering principles, it is proper for a lead agency to use its discretion to focus a first-tier EIR on only the general plan or program, leaving project-level details to subsequent EIR's when specific projects are being considered. (See Cal. Code Regs., tit. 14, § 15152, subd. (b).) This type of tiering permits a lead agency to use a first-tier EIR to adequately identify 'significant effects of the planning approval at hand' while deferring the less feasible development of detailed, site-specific information to future environmental documents. (See *id*., § 15152, subd. (c).) In determining the

21

adequacy of an EIR, the CEQA Guidelines look to whether the report provides decisionmakers with sufficient analysis to intelligently consider the environmental consequences of a project. (Cal. Code Regs., tit. 14, § 15151.) The CEQA Guidelines further provide that 'the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' " (*Id*. at pp. 1174-1175.) This is the approach taken by the State Board in the present case.

It is true that, if the Regional Board decides to adopt a categorical WDR waiver policy regarding vineyards, as well as other sources of sediment, that would be a further regulatory document which would not be site-specific but which would serve as a basis to regulate site-specific proposals by vineyard owners in the future. But unlike the water sources in *Stanislaus Natural Heritage Project* or the sewer extension in *San Joaquin Raptor*, whether the Regional Board settles on enforcing the performance standard for vineyards through WDRs or waivers, LRC cites no good reason why, nor any CEQA requirement mandating that, this decision must be made now. That is particularly true since the State Board has acknowledged that further CEQA review would be necessary for the adoption of any such policy, and that the effectiveness and applications to individual landowners who might apply for a permit or a waiver would be subject to the strict regulatory controls specified in the Policy For Implementation and Enforcement of the Nonpoint Source Pollution Control Program adopted by the State Board on May 20, 2004.

The trial court found that, "The Basin Plan Amendment sets a performance standard and in the adoption of the waiver policy the Board can more closely examine how it will meet that standard both in policies and as applied to individual locations." We agree that whether the Regional Board decides to enforce the TMDL through WDRs or waivers of WDRs with required follow-up, the State Board's decision to defer the issue was appropriate.

Given our conclusions, we do not discuss the other arguments and contentions made by the parties.

22

**DISPOSITION**

The judgment is affirmed. The State Board is awarded costs of appeal.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constiution.