Filed 1/30/25  P. v. Campaz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CARLOS TOMAS CAMPAZ, JR.,<br><br>　　　　Defendant and Appellant. | C099650<br><br>(Super. Ct. No. 04F07255) |

Defendant Carlos Tomas Campaz, Jr., challenges the denial of his petition for resentencing under Penal Code section 1172.6.  Statutory section citations are to the Penal Code unless otherwise stated.  He argues that substantial evidence does not support the trial court's conclusion that he is guilty of second degree murder under the legally valid theory of aiding and abetting with implied malice.  He also argues the trial court erroneously denied a motion he brought for a directed verdict of not guilty on the grounds that issue preclusion and judicial estoppel barred the People from arguing defendant was

1

guilty of second degree murder as a direct aider and abettor. Finally, he argues we must reverse and remand this case to allow the trial court to consider the impact of defendant's youth on his ability to form the requisite mental state to be found guilty of second degree murder as a direct aider and abettor. We affirm the trial court's ruling.

## FACTS AND HISTORY OF PROCEEDINGS

Discovery of Jerimi Millican's Body

During the morning of August 5, 2004, workers at Gardenland Park discovered the body of Jerimi Millican in the bathroom.

Millican's death was caused by multiple stab wounds. A pathologist diagramed 26 sharp force wounds on Millican's body, with one to his heart and some to his lungs. The wounds were likely caused by two knives, but it is possible they were caused by one. Millican's body had some smaller evenly spaced puncture wounds that may not have been caused by a knife.

Millican's blood had methamphetamine in it, and there were bindles with methamphetamine in his shorts. Investigators found a broken glass pipe near the entrance to the restroom.

2007 Trial

Defendant, John White, and Robert Montoya were tried for Millican's murder in 2007. The following is a summary of key testimony presented at trial.

Testimony of M.C.

In the summer of 2004, M.C. was dating E.Q. and sometimes resided in E.Q.'s home. Defendant lived there at the same time as M.C. for a couple months. Around Christmas 2003, M.C. gave defendant a pocketknife with a custom blade.

At the time of the murder, M.C. was in Oregon. When M.C. got back from Oregon, E.Q. informed M.C. that she had kicked defendant, E.Q.'s adopted daughter M.,

2

M.'s boyfriend T.W., and M.'s biological brother A.M. out of the house. That day, M.C. read about the murder in a newspaper.

That afternoon M.C. took a letter to defendant at White's house. She also took defendant out for lunch.

At lunch, defendant asked M.C. if it makes you a bad person to exchange one sin for another, and he told her White had gotten him 25 to life. Defendant then told M.C. about his involvement in Millican's murder. Defendant told M.C. that White asked him the night before the murder to back him up while White tried to beat up Millican because Millican had raped White's sister. A plan was devised with defendant, White, and Montoya. Montoya, who knew Millican, would take Millican to the park saying it was for a drug deal.

White and defendant traveled in one truck to the park and waited. Montoya and Millican arrived in another truck. Millican went into the bathroom and White and defendant followed him. Once in the bathroom, White started screaming at Millican, pulled out knives, and began hitting and stabbing Millican in a rage. Defendant became scared and backed up against the wall of the bathroom. There was blood everywhere. Defendant felt sick and nauseas and later threw up outside. Defendant told M.C. he had never seen anyone get stabbed to death or beaten that way, and that White was going crazy and out of control. Defendant told M.C. that Millican made a last effort to run, but defendant panicked and pushed Millican back into the bathroom. Millican later fell to the ground and stopped fighting the attack. White stepped over the victim to urinate, and defendant yelled that they needed to go.

White, defendant, and Montoya left in the truck Montoya had driven to the park.

Back at White's house, White directed Montoya and defendant to the roof, where the group took their clothes off, and White had them come down one at a time to shower. White gathered up the clothes and weapons to dispose of.

Around this time, M.C. was doing some work at White's house. Over the next couple weeks, she would sometimes see defendant, and defendant and White would share new and different details about the murder.

One time, when M.C. asked defendant what he meant when he said he panicked, he responded he "didn't want the kid to run outside bleeding to death."

Defendant told M.C. that White had made Montoya stab Millican during the attack to prevent Montoya from snitching.

One time, White described the knife he used as having a grip with spikes like pointed knuckles, which defendant characterized as "vicious."

White also showed M.C. a sheath for a knife that was maybe 10 inches long and 2.5 inches wide, but the knife was missing.

White and defendant also described an incident where White had threatened A.M. with a machete and forced him to record himself confessing to the murder. White said he did this because A.M. had been at the house when they returned from the murder and had seen them covered in blood.

At one point, defendant returned the knife M.C. had given him, saying he had cleaned it, and he asked her to alter the blade. She later gave the knife to the police.

Another time, defendant expressed he was angry with White because he had learned Millican never raped White's sister.

When M.C. spoke with a detective, she told the detective defendant had told her the plan was to murder the victim, but at trial she could not recall if defendant had said that or just that the plan was to beat up Millican. At one point, defendant told her he did not know White brought a knife to the park.

M.C. testified at trial that she used methamphetamine recreationally in 2004, including at White's house. She admitted she had trouble remembering dates when things happened. She admitted to an arrest on a misdemeanor charge while this case was pending, and that the case was dismissed.

4

M.C. characterized defendant as about half the size in 2004, when regularly using methamphetamine, as he was at trial in 2007. She agreed it would be fair to say he was not the brightest kid and easily tricked. She said she would consider White to be more intelligent than defendant. She admitted she can be mean when she gets mad.

At the time of trial, M.C. was no longer seeing E.Q. The two had a disagreement about M.C. testifying. E.Q. begged M.C. not to testify and offered her money to relocate and not testify. This made M.C. angry. The court played angry messages M.C. left for E.Q. In one message, M.C. said she would do the "damndest to make sure I inflict as much heartache that was inflicted upon me back."

As the case moved forward, M.C. received threats from White to discourage her from testifying, causing her to relocate three times. She had moved far enough away by the time of trial that she was flown in to testify.

M.C. denied having paranoid thoughts. She admitted to once thinking everyone at work was out to get her, and said someone had shot at her at her job. She testified her coworker threatened to shoot her. She said after she was chased by a coworker with a gun, she voluntarily checked into a mental hospital. She did not recall the exact date, but said it was in the mid 1990's. She admitted to being hospitalized twice in Stockton in the mid 1990's and in San Diego in 1995. She testified that, to her knowledge, her hospitalizations were voluntary. She does not recall being kept after 72 hours against her will or being diagnosed with borderline personality disorder.

Other Witness Testimony

T.W. testified he believed M.C. was using methamphetamine a couple times a week around the time of the murder. At some point in his testimony, he said she was using drugs every day for years before the murder. He characterized M.C. as someone who exaggerates a lot and blows things out of proportion.

T.W. also testified that he had taken a road trip with defendant shortly before the murder, after which he let defendant sleep in the truck they used for the night. The next time he saw the truck is when he spotted it parked near Gardenland Park after the murder.

M.G. and A.M. both testified about being at White's house the night before and morning of the murder. They both saw defendant, Montoya, and Millican at the house. M.G. heard White ask him to watch the house when White went somewhere early in the morning. A.M. saw defendant, White, Montoya, and Millican all leave around the same time. They both heard glass breaking in the back of the house later that morning. M.G. saw defendant, White, and Montoya on the roof of the house. A.M. saw defendant enter the house with blood on his shoes, and there was blood on defendant's, Montoya's, and White's shoelaces. A.M. saw them put clothes in what looked like a plastic bag, which White later left with.

A.M. asked them where Millican was. A.M. described defendant, Montoya, and White threatening him, with White wielding a machete. A.M. said they forced him to make a recording confessing to killing Millican.

T.C. testified about picking White up at his house on August 5, 2004, where he saw defendant and Montoya. White put a blanket in T.C.'s trunk and had T.C. drive around until they wound up near a river. White said he had to go the bathroom and asked T.C. to pop the trunk. White walked a bit, and T.C. saw a splash. Later the blanket was gone. White was upset that morning and said things like, "I fucked up," and "we fucked up." A couple days later, when T.C. tried to bring the incident up again, White got emotional and said they hurt someone, using the words "kill" and "murder." He told T.C. the "guy" had owed him money, though in the car ride White told T.C. the guy had raped a little girl. T.C. said White's sister threatened him before the preliminary hearing.

G.C. witnessed two men trying to burn a blue truck across from her home. Criminalists with the county later found blood matching Millican's DNA profile in the truck and a fingerprint that matched Montoya.

6

The pathologist who examined Millican's body testified that a knife like the one M.C. described with the spiked grip could have caused some of the puncture wounds he observed, and the blade could have caused many of the other wounds on the body.

Defendant's Expert Witness

Defendant called a clinical neuropsychologist as an expert in clinical psychology.

The expert reviewed some of M.C.'s mental health records. He testified she had an involuntary hospitalization in 1997 with a follow-up appointment in May 1998. Her discharge diagnosis was adjustment disorder with mixed disturbance of emotions and conduct, and an Axis II diagnosis of mixed personality disorder with borderline, paranoid, and narcissistic features. He said the behavioral description from 1997 described someone with a relatively severe disorder.

Notes the expert reviewed stated that M.C. talked about taking revenge, killing her coworkers, killing her employer, then killing herself. She had questionable judgment and had been or was on various medications.

In 1998, treating professionals deferred giving M.C. an Axis II diagnosis, and gave her an Axis I diagnosis of depressive disorder, adjustment disorder, and ruled out post-traumatic stress disorder. At her May 1998 outpatient visit, her condition was mild to moderate.

The expert testified that people with severe personality disorders, in times of stress, will distort information to fit their model of the world. What they report back about what happened won't be what happened, but their interpretation of what happened. It is also possible for them to accurately perceive events. People with personality disorders tend to believe they are "absolutely right" and "everybody else is wrong."

The expert testified when a person has a personality disorder, their story regarding what has happened to them can change over time along with their interpretations. They tend to exaggerate.

7

Leaving threatening and angry messages is consistent with the borderline paranoid narcissistic personality disorder and substance abuse. The phone messages M.C. left E.Q. were consistent with this personality disorder.

The expert looked at some documents from 2005 that refer to M.C. having homicidal rage and episodes of mania. The records suggest M.C. having memory loss regarding what she has done after rages. The expert said this behavior is "extremely strong evidence" that M.C.'s borderline personality disorder continued for over 10 years. The expert said the behavior was consistent with the borderline personality issues he described and stimulant substance abuse, such as methamphetamine.

The expert testified substance abuse can multiply the impact of these traits. Drug use can cause missed and confused memories. You may remember hearing something you never heard. If someone has borderline personality disorder, the use of methamphetamine will trigger that part of their personality. By itself, methamphetamine can make someone paranoid. A person without a personality disorder who uses methamphetamine and is up for days can feel threatened, hallucinate, and have delusions. Studies have shown methamphetamine use can cause brain damage that affects memory function.

2007 Verdict and Appeal

The jury was instructed that defendant could be found guilty of a crime—in this case first or second degree murder—based on (1) direct aiding and abetting of the murder; or (2) under the natural and probable consequences doctrine, where defendant may have directly aided and abetted in an assault, and a reasonable person in defendant's position would have known a natural and probable consequence of the assault would be murder.

In May 2007, the jury found defendant guilty of first degree murder in violation of section 187, subdivision (a). The jury found not true the special-circumstances allegation

8

that defendant had intentionally killed the victim while lying in wait as contemplated by section 190.2, subdivision (a)(15).  The jury also found not true the special-circumstances allegation that defendant had personally used a deadly and dangerous weapon, a knife, as contemplated by section 12022, subdivision (b)(1).

The trial court sentenced defendant to an indeterminate term of 25 years to life.

This court affirmed the judgment on appeal.  (*People v. Campaz* (Apr. 27, 2010, Nos. C056880, C058484) ___Cal.App.4th___ [2010 Cal. App. Unpub. LEXIS 3066, at *110].)

### 2017 Habeas Petition and Resentencing

In 2014, the California Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*) that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine.  In 2017, defendant brought a petition for habeas corpus, arguing under *Chiu* he could not be convicted of first degree murder based on the natural and probable consequences doctrine (*Chiu* petition).

In 2020, the trial court granted the writ of habeas corpus sought in the *Chiu* petition, and it vacated the underlying judgment and sentence.   The trial court concluded the first degree murder conviction could not be sustained under *Chiu* because it could not conclude beyond a reasonable doubt that the jury convicted defendant of first degree murder under a valid theory, either as a direct accomplice or as a person who acted with premeditation and deliberation.  The trial court concluded, based on the not true findings on the special circumstances allegations and questions asked by the jury during deliberations, that the jury had rejected a claim by a codefendant that defendant had actually committed the murder.  The trial court concluded the jury must have based its verdict on the aiding and abetting theory, and the jury's questions suggested it had been

9

focused on the natural and probable consequences doctrine.  The trial court gave the People the option to retry defendant or accept a reduction to second degree murder.

The People elected to accept a reduction to second degree murder.  At the resentencing hearing, the People stated, "our office has elected to accept the reduction to second-degree murder with the understanding that it doesn't reflect in any way upon our belief that it should stay second-degree murder in spite of [1172.6].  [¶]  We do intend to argue that they're not interrelated in that aspect and that we will be opposing any additional reduction."

The trial court entered a verdict of second degree murder.  In June 2020, the trial court resentenced defendant to an indeterminate term of 15 years to life.

2019 Petition for Resentencing Under Section 1172.6

While defendant's *Chiu* petition was pending, he filed a petition for resentencing under former section 1170.95 (section 1172.6 petition), which has subsequently been renumbered to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  After the trial court appointed counsel for defendant and the parties briefed whether defendant had stated a prima facie case for relief under section 1172.6,  the trial court concluded defendant was not eligible for relief and defendant appealed.  The People conceded error on appeal and in *People v. Campaz*, case No. C093174, we reversed the trial court's denial of the petition and directed the trial court to issue an order to show cause and hold a hearing to determine if defendant was entitled to relief under section 1172.6.

The trial court issued the order to show cause, and the People filed a brief opposing the petition.  Defendant filed a responsive brief.

The trial court held an evidentiary hearing on the section 1172.6 petition in July 2023.  The People relied on the record of conviction and transcripts from the initial trial as evidence for the proceeding.  Defendant testified.

10

<u>Defendant's</u> <u>Testimony</u> <u>at</u> <u>the</u> <u>Section</u> <u>1172.6</u> <u>Hearing</u>

According to defendant, on August 5, 2004, White and Montoya killed Millican.

The night before the killing, defendant was at White's house. People were smoking methamphetamine and partying. He had been with White for about two days, and they were smoking methamphetamine and working on White's house. Millican showed up at around 11:00 p.m. or 12:00 a.m. and was using methamphetamine with others. A.M., M.G. and others were at the house too.

White took defendant and Montoya aside for a conversation. White said Millican had raped White's sister when they were younger, and he wanted to beat him up. He asked if defendant and Montoya would have his back. White just said he wanted to beat Millican up.

Montoya agreed to take Millican to the park, and defendant and White pulled up immediately afterward.

All four of them went into the bathroom to smoke methamphetamine. They were passing the methamphetamine pipe around, and White started punching Millican. Defendant was shocked and dropped the methamphetamine pipe. Defendant heard Millican screaming. He saw some blood. The blood was just a little blood from Millican's mouth, where White had punched him. It was not a pool of blood. Defendant backed up against a wall, panicked.

According to defendant, when Millican tried to run, Montoya pushed Millican back and started stabbing Millican in the chest. When Millican fell, Montoya continued to stab Millican in the back. Defendant described Montoya's knife as like a "Rambo knife." Defendant did not see White stab Millican. White said they needed to go right away. They ran out of the bathroom, jumped in the truck, and left.

11

Defendant testified he did not know that White or Montoya were armed when they went to the park. Defendant said he was not armed with a knife at the time of the attack. Defendant said he never touched Millican.

White told defendant and Montoya to try to burn the truck they left the park in. Montoya and defendant tried to burn the truck, but it wouldn't light. They panicked and ran back to White's house.

Montoya and defendant ran through the house and White had a ladder on the side of the house. White told them to go onto the roof and get undressed, and White started spraying them with a water hose. Defendant saw a second knife when White was putting evidence of the attack in a blanket afterward.

Defendant acknowledged having some conversations with M.C. He said some of what she testified about was accurate but other parts were "off the wall." As an example, he said he did not push Millican, Montoya did. He did not tell M.C. he pushed Millican. Defendant said he described the knife Montoya had to M.C., because that is what Montoya used when he pushed Millican back into the bathroom and Montoya began stabbing Millican. He said M.C. would sometimes talk to Montoya, defendant, and White together, and sometimes individually. She was at the house working on remodeling and using methamphetamine with them. He thought it was possible M.C. testified the way she did because she was mad at him or E.Q., who he described as his mother-in-law. Defendant testified M.C. would supply them with methamphetamine and smoke it with him when they both stayed at E.Q.'s.

He characterized M.C. as a dramatic person, who tends to exaggerate things. Defendant testified that E.Q. and M.C. would get into arguments about M.C. exaggerating things. He agreed that M.C. could be manipulative and would distort things for revenge.

12

Defendant had known White from high school.  White was letting defendant stay at his home because defendant was homeless.  He felt obligated to have White's back when White asked.

Trial Court's Ruling on the Section 1172.6 Petition

In October 2023, the trial court entered an order finding beyond a reasonable doubt that defendant is guilty of second degree implied malice murder under a direct aiding and abetting theory and denying the section 1172.6 petition.

The court stated it found M.C.'s testimony credible.

The court concluded defendant had the requisite mens rea.  The court observed defendant was well aware of the hostility White felt toward Millican, and that White's plan was to commit a surprise attack while defendant and Montoya served as backup.  It noted defendant could hear Millican screaming and see blood before Millican attempted to escape.  The court noted that even if defendant was unaware of White's intentions prior to the attack, once the attack began, "there would have been no doubt that White was intending to kill Millican."  Thus, "[a]t the moment that Campaz pushes Millican back, Campaz would have known that White was intending to, and in fact was trying to, kill Millican."  The court found defendant's act of stopping Millican from escaping and pushing him back "towards an armed and enraged White is a clear manifestation of Campaz's intent to aid White in killing Millican.  In considering whether Campaz knew that White repeatedly stabbing Millican was dangerous to human life, this Court is satisfied that a 21 year old Campaz would know that such an act was dangerous to human life."  The court was also "sufficiently convinced beyond a reasonable doubt that Campaz acted in conscious disregard for human life by preventing Millican's escape and pushing him back into harm's way."  By the time Millican tried to escape, defendant would have known White was trying to kill Millican, and by actively placing Millican in a position where the attack could resume, he chose to ignore the threat to Millican's life.

The court found the actus reus was the act of stopping Millican from escaping and pushing him back towards White.

Defendant filed a timely notice of appeal.

DISCUSSION

I

*Aider and Abettor Liability for Murder*

In general, "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.)

Under the law in effect at the time of the 2007 trial, "an aider and abettor could be convicted for second degree murder committed by the direct perpetrator under two alternative theories: (1) a defendant with the necessary mental state could be liable under direct aiding and abetting principles, or (2) a defendant could be liable not only for the intended crime, but also for any offense that was the natural and probable consequences of the crime aided and abetted." (*People v. Powell* (2021) 63 Cal.App.5th 689, 710-711 (*Powell*).) We will refer to liability under the first theory as "direct aider and abettor liability," and to liability imposed under the second theory as "natural and probable consequences liability" or as liability under the "natural and probable consequences doctrine."

Under the natural and probable consequences doctrine, a person who knowingly aided and abetted criminal conduct in an intended crime (target offense) could also be found guilty of murder, even if unintended, if the murder was the natural and probable consequence of the target offense. (*Chiu*, *supra*, 59 Cal.4th at p. 161.)

In *Chiu*, our Supreme Court held that an aider and abettor to a crime cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at pp. 158-159.) Because the *Chiu* jury

had been instructed that defendant could be found guilty of first degree murder under either direct aider and abettor liability or under natural and probable consequences liability, his "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory" or direct aider and abettor liability. (*Id.* at pp. 160, 167.) Finding it could not make that conclusion, the Supreme Court affirmed the Court of Appeal's reversal of the first degree murder conviction with directions that allowed the People to either accept a reduction of the conviction to one for second degree murder or to retry the case. (*Id.* at pp. 167-168.)

In 2018, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Accordingly, Senate Bill 1437 amended section 188, by adding a requirement that, except as stated in section 189, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Thus, Senate Bill 1437 defined malice such that a person who acts as an aider and abettor to a crime can no longer be convicted of murder under natural and probable consequences liability. (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*).)

However, "aiding and abetting implied malice murder [remains] a viable form of murder liability." (*People v. Vizcarra* (2022) 84 Cal.App.5th 377, 391; see also *People v. Harris* (2024) 105 Cal.App.5th 623, 631 (*Harris*).) Under this theory, a person " 'who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' " (*People v. Silva* (2023) 87 Cal.App.5th 632, 639-640.)

15

Senate Bill 1437 also added what is now section 1172.6, which applies Senate Bill 1437's amendments to the murder statutes retroactively by allowing persons who were, "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder . . . conviction vacated and to be resentenced on any remaining counts when [specified] conditions apply." (§ 1172.6, subd. (a).)

If the petitioner makes a prima facia case for relief, the court must issue an order to show cause. (§ 1172.6, subd. (c).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.* at subd. (d)(3).) "At this stage, '[t]he question is whether the petitioner committed [the underlying crime] under a still-valid theory, and that is a factual question.' (*People v. Clements* (2022) 75 Cal.App.5th 276, 294 [].) The trial court is therefore 'a fact finder tasked with holding the People to the beyond a reasonable doubt standard' and ' "must impartially compare and consider all the evidence that was received throughout the entire trial" and determine whether that "proof . . . leaves you with an abiding conviction that the charge is true." [Citations.]' (*Id.* at pp. 294-295.)" (*Harris*, *supra*, 105 Cal.App.5th at p. 632.)

II

*Substantial Evidence Claim*

A. <u>Standard</u> <u>of</u> <u>Review</u>

We review a trial court's denial of a section 1172.6 petition for substantial evidence. (*Reyes*, *supra*, 14 Cal.5th at p. 988; *People v. Njoku* (2023) 95 Cal.App.5th 27, 41.) " 'In reviewing the trial court's findings for substantial evidence, we . . .

16

" ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt." ' [Citation.] . . . While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." ' ([*People v. ]Oliver* [(2023)] 90 Cal.App.5th [466,] 480.)" (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414 (*Pittman*).)

        B.  <u>Defendant's</u> <u>Guilt</u> <u>as</u> <u>an</u> <u>Aider</u> <u>and</u> <u>Abettor</u> <u>Under</u> <u>an</u> <u>Implied</u> <u>Malice</u> <u>Theory</u>

        Direct aiding and abetting liability for murder, " 'is based on the combined actus reus of the participants and the aider and abettor's own mens rea. ([*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [].]) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' (*Powell*, *supra*, 63 Cal.App.5th at pp. 712-713, fn. omitted; see id. at p. 713, fn. 27 ['The relevant act is the act that proximately causes death.' . . . .)" (*Reyes*, *supra*, 14 Cal.5th at pp. 990-991; accord, *People v. Silva*, *supra*, 87 Cal.App.5th at p. 640.) The intent required to be

found a direct aider and abettor in a crime can be formed during the perpetrator's commission of the crime. (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065-1066.)

Defendant argues that the trial court's conclusion that he is guilty of murder under an implied malice theory of aiding and abetting is not supported by substantial evidence. First he argues the evidence is not sufficient to prove he pushed Millican back into the bathroom. Second, he argues evidence was insufficient to show he acted with a conscious disregard for human life.

Sufficient evidence supports a finding that the requisite actus reus occurred: the evidence supports that defendant pushed Millican back into the restroom and toward his attacker, effectively ending any chance Millican had at surviving the murderous attack. Defendant's efforts to escape this conclusion come down to a challenge to the credibility of M.C.'s testimony. This is really an attempt to have this court reweigh the evidence proffered by M.C. and evidence others offered that may cast doubt on her credibility. But, this argument "misapprehend[s] our role in a substantial evidence review." (*People v. Cody* (2023) 92 Cal.App.5th 87, 112.) "As a reviewing court, our role is not to reweigh the evidence," or to reevaluate a witness's credibility. (*People v. Thomas* (2023) 14 Cal.5th 327, 379; *People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) The trial court expressly found M.C.'s testimony to be "credible and reliable." On the record before us this finding is justified. M.C. had little to gain from testifying, and she believed testifying put her at risk. Many of the details M.C. included in her narrative of the events that unfolded the night of the murder were amply supported by the testimony of other percipient witnesses, lending credence to the details she alone was privy to because of her conversations with defendant.

Substantial evidence also supports a finding that defendant acted with a conscious disregard for human life when he pushed Millican back toward his attacker. Defendant argues that all the evidence shows is he pushed Millican in a panic, and, therefore, he lacked the mindfulness necessary to constitute a conscious disregard for Millican's life.

18

But even if he was scared and felt panicked, defendant would have known, given the level of rage and amount of blood he witnessed, that pushing Millican back into the bathroom with White would very likely lead to Millican's death. Moreover, M.C. testified that defendant once told her he pushed Millican because, "he just panicked, and he just wanted to stop the kid from running out because he already knew it was a bad situation." According to M.C., he said he "didn't want the kid to run outside bleeding to death." This supports a finding that defendant knew Millican was probably going to die, and defendant pushed Millican because defendant wanted to stop Millican from getting out of the restroom where he would be away from White.

## III

### *Motion for a Directed Verdict*

Defendant argues the trial court erred in denying his motion for a directed verdict of not guilty of murder. This argument is also unpersuasive.

In making his argument, defendant fails to articulate the law to be considered by a trial court in evaluating a motion for directed verdict or by a Court of Appeal in considering the denial of that motion.

Additionally, rather than craft an argument tied to standards of appellate review, defendant block quotes the argument contained in his motion in the trial court and says the trial court was wrong to reject it. The result of the use of this block quotation is that defendant's appellate brief lacks headings that "summarize the point" being made, and the minimalist headings used are not captured in the table of contents. (See Cal. Rules of Court, rule 8.204(a)(1).) Both failings give this court reason to find against defendant on this issue before turning to the merits. (See *People v. Foss* (2007) 155 Cal.App.4th 113, 126 ["When an appellant fails to apply the appropriate standard of review, the argument lacks legal force"]; *San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1135 [a party forfeits an

19

argument on appeal by failing to separately head it]; Cal. Rules of Court, rule 8.360(a) [applying rule 8.204 to briefs in criminal appeals].)  However, we find we can also reject the arguments, which are based on theories of issue preclusion and judicial estoppel, on the merits.

We begin by noting that defendant's characterization of the ruling on the *Chiu* Petition, upon which his subarguments were based, mischaracterizes the ruling. Defendant wrote that in granting the *Chiu* petition the trial court, "held that this quantum of evidence cannot support a finding of murder beyond a reasonable doubt.  As such, the court reduced the conviction to a second degree murder by way of the natural and probable consequences doctrine.  The prosecutor then had the opportunity to retry the case. . . .  The prosecutor chose not to do so."

A reversal of a first degree murder verdict under *Chiu* is based on a court's conclusion that it cannot "conclude beyond a reasonable doubt *that the jury based its verdict on the legally valid theory*" of direct aider and abettor liability.  (*Chiu*, *supra*, 59 Cal.4th at p. 167, italics added.)  Thus, in reversing the first degree murder conviction, the trial court did not find that the evidence *could not* support a jury finding of first degree murder under a valid theory.  The court found only the court itself could not conclude beyond a reasonable doubt that the jury reached its verdict based on a valid theory.

Also, in reducing the verdict to one for second degree murder, the court did not expressly find—and the prosecutor did not accept—that the verdict was being entered based on the natural and probable consequences theory of second degree murder.  While *Chiu*, before the passage of Senate Bill 1437, would have allowed a natural and probable consequences second degree murder conviction to stand, it does not say that a second degree murder conviction entered following a reversal would necessarily be based on the natural and probable consequences theory.  The only thing the prosecutor accepted in not retrying the case was a second degree murder verdict.  Conceivably, under the prior law,

20

defendant could be guilty of (1) second degree murder as a direct aider and abettor; and (2) first degree murder under the natural and probable consequences doctrine. To wit, as explained above, sufficient evidence supports the trial court's conclusion that when he pushed Millican, defendant engaged in direct aiding and abetting implied malice second degree murder. At the same time, under the law as it existed at the time of the trial and the theories presented to the jury, the jury may have found defendant guilty of first degree murder based on natural and probable consequences liability due to his role in aiding and abetting White in the commission of a planned assault likely to cause great bodily injury. However, it never made any express findings regarding second degree murder because it was only directed to consider second degree murder if it did not find defendant guilty of first degree murder.

With this more precise characterization of the trial court's ruling on the *Chiu* petition in mind, defendant's arguments for issue preclusion and judicial estoppel fail.

"As traditionally understood and applied, issue preclusion bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*People v. Strong* (2022) 13 Cal.5th 698, 716; accord, *People v. Burgess* (2023) 88 Cal.App.5th 592, 600.)

Here, in ruling on the *Chiu* petition, the trial court was not asked to decide if defendant could be found guilty of second degree murder based on direct aider and abettor liability beyond a reasonable doubt. It also made no finding that defendant's second degree murder liability was based on the natural and probable consequences doctrine. All it found was that the first degree murder conviction needed to be vacated

21

because it could not say beyond a reasonable doubt that the jury did not convict defendant of first degree murder based on the natural and probable consequences doctrine. The issue raised by the section 1172.6 petition, that is, whether defendant was, in fact, found guilty of the murder based on the natural and probable consequences doctrine, was not identical to the issues in the *Chiu* petition and it was not necessarily decided as part of the proceedings on the *Chiu* petition.

Similarly, " ' " '[j]udicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] *The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies.* [Citation.] Application of the doctrine is discretionary.' " [Citation.] The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." [Citations.]' (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987 [], italics added (*Aguilar*); see also *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 [] (*MW Erectors*).)" (*People v. Castillo* (2010) 49 Cal.4th 145, 155.)

The People's position in accepting the second degree murder verdict during the *Chiu* petition proceedings is not "totally inconsistent" with the position it took in opposing the section 1172.6 petition. In both proceedings, the People took the position defendant was guilty of second degree murder.

## IV

### *Consideration of Defendant's Youth*

Defendant was 21 years old when he participated in the attack on Millican. Defendant argues remand is required to allow the trial court to consider the impact his youth and immaturity had on his ability to form the requisite mental state to be found guilty of implied malice second degree murder based on direct aider and abettor liability.

Defendant relies on *Pittman* to make this argument. In *Pittman* the defendant petitioned for section 1172.6 relief for his second degree murder conviction based on his aiding and abetting in a murder when he was 21 years old. (*Pittman*, *supra*, 96 Cal.App.5th at pp. 403-404.) On appeal, the defendant argued that the Court of Appeal should remand his case to the trial court to consider his youth given cases published after the trial court's ruling on his petition that "require[] courts to consider how youth impacts a defendant's ability to form a sufficiently culpable mental state to support a felony-murder conviction." (*Id.* at p. 404; see also *id.* at p. 416 [listing cases published beginning in 2021].) Finding the policy interests underlying felony-murder cases applied equally to implied malice murder, the court held that if a defendant is 25 years or younger, his or her youth is a "factor in the totality of circumstances bearing on whether [he or she] acted with implied malice." (*Id.* at p. 417.) The court could not conclude that the trial court's failure to consider the defendant's youth was harmless, and remanded the case to the trial court to consider how the defendant's youth "impacted his ability to form the requisite mental state for second degree murder." (*Id.* at p. 418.)

Defendant did not make an argument that the trial court ought to consider his youth in the trial court. Noting the evidentiary hearing in this case occurred a few months before and the trial court's ruling was entered 11 days before the *Pittman* decision was issued, defendant argues he did not forfeit his ability to raise this issue on appeal.

23

In *Pittman*, the petitioner also made no argument regarding his youth in the trial court, and the Court of Appeal found the issue had not been forfeited. (*Pittman*, *supra*, 96 Cal.App.5th at p. 416.) The *Pittman* court rejected the Attorney General's forfeiture arguments on the grounds that, "The trial court issued its order on Pittman's petition in December 2020. The relevant appellate cases were not decided until 2021 or later." (*Id.* at p. 416.) Defendant argues the same should apply here because *Pittman*'s extension of the requirement that courts consider youth to implied malice murder convictions was a change in the law that warrants an exception to forfeiture standards.

"All issues . . . are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.) "Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or *wholly unsupported by substantive law then in existence*." (*People v. Welch* (1993) 5 Cal.4th 228, 237, italics added.) Here, while *Pittman* was decided after the trial court made its ruling, all seven cases *Pittman* relied upon in reaching its holding had been decided by the time the trial court held the hearing and entered its ruling here. (*Pittman*, *supra*, 96 Cal.App.5th at p. 416 [the latest publication date on the listed cases was for *People v. Oliver* (2023) 90 Cal.App.5th 466 (*Oliver*), which was published Mar. 23, 2023].) In finding the *Pittman* defendant had not forfeited his argument regarding youth, the court observed that, "[t]he relevant appellate cases were not decided until 2021 or later." (*Pittman*, at p. 416.) In contrast, here defendant had the benefit of all the cases *Pittman* considered and still did not raise the issue in the trial court.

Even if this argument had not been forfeited, we find it unpersuasive. On appeal, " ' "a trial court is presumed to have been aware of and followed the applicable law. [Citations.]" ' (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [], quoting *People v. Mosley* (1997) 53 Cal.App.4th 489, 496–497 [].) ' "Perhaps the most fundamental rule of

24

appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." ' (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [], quoting *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [].)" (*People v. Picazo* (2022) 84 Cal.App.5th 778, 802.)

As noted, at the time the trial court made its ruling on the petition, all the cases *Pittman* considered had been decided. That is, the role that youth should play in ruling on a section 1172.6 petition was not entirely undeveloped. We presume the trial court knew about the issue. Additionally, on this record, there is evidence that the trial court did, in fact, consider defendant's relative youth. In making its ruling, the court both (1) noted that M.C. had testified that E.Q. had "kicked all the *kids* out of the house"; and (2) found that "*a 21 year old* Campaz would know that an act was dangerous to human life." (Italics added.) That is, the court concluded that, at 21, defendant could "appreciate [the] risks and consequences" of pushing Millican back towards White. (See *In re Moore* (2021) 68 Cal.App.5th 434, 454 ["the 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences'—are arguably more germane to a juvenile's mental state than to his or her conduct"].)

Additionally, even if we were to assume the trial court did not "fully" consider all possible evidence regarding defendant's youth, given this finding regarding the impact of defendant's age, we find no prejudice to defendant. (See *Oliver*, *supra*, 90 Cal.App.5th at p. 489 [noting when considering the youth of a 23 year old defendant that "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26"].) For this reason, we also find defendant's counsel was not ineffective for failing to develop an argument regarding his youth. (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1193 [To succeed in an ineffective assistance of counsel claim, an appellant must show prejudice, which is shown when there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome].)

25

DISPOSITION

The trial court's order denying defendant's petition for resentencing under section 1172.6 is affirmed.

                                      _____

                                      HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

FEINBERG, J.

26